**UNITED STATES of America,**
**Plaintiff,**

v.

**Art C. NEWMAN, Defendant.**

**Civ. No. 3015.**

United States District Court,
D. Hawaii.

Oct. 7, 1971.

Michael Sherwood, Asst. U. S. Dist. Atty., Robert K. Fukuda, U. S. Dist. Atty., for plaintiff.

Myer Cyril Symonds, Honolulu, Hawaii, Bouslog & Symonds, Honolulu, Hawaii, of counsel, for defendant.

### DECISION

TAVARES, District Judge.

This action was brought by the United States of America (Federal Aviation Administration) to recover a civil penalty in the sum of Six Thousand Dollars ($6,000.00) from the defendant, Art C. Newman, the holder of Federal Aviation Administration Airman Certificate No. 1015790 with Airline Pilot Rating, and who was at all times of significance herein, employed as an airline transport pilot and command pilot by Aloha Airlines, Inc., a Hawaiian Corporation, which has its principal place of business within the jurisdiction of this Court, under Section 901(a) (1) of the Federal Aviation Act of 1958, as amended, 49 U.S.C. 1471(a).

The action seeks to recover a civil penalty in the sum of One Thousand Dollars ($1,000.00) from the defendant based upon a violation of Section 91.9 of the Federal Aviation Regulations (14 C. F.R. 91.9) [1] in that defendant allegedly operated the Viscount aircraft carelessly and in a manner which endangered life or property of others by reason of his failure or refusal to have a known malfunction of the aileron trim tab actuator assembly corrected prior to the five flights which took place on July 3, 1968.

Civil penalty in the sum of FIVE THOUSAND DOLLARS ($5,000.00) is sought from the defendant based upon his having taken off the aircraft on the five separate flights, described above, at a time when equipment required to be operable in order to comply with airworthiness requirements under which the aircraft was type-certified was in fact operating improperly, e. g., the aileron trim tab actuator assembly, in violation of Section 121.303(d) (1) of the Federal Aviation Regulations (14 C.F.R. 121.-303(d) (1) ).[2]

By the Pretrial Order herein (R. p. 18) it was agreed by the parties that on July 3, 1968, the defendant was the pilot in command of Aloha Airlines V–745D, a Viscount aircraft which made five take-offs and landings with 10 to 52 passengers in traveling from the Hawaiian Islands of Oahu to Molokai to Maui to Kona on Hawaii, thence returning to Maui and back to Oahu, the point of origin.

The aircraft was equipped with an aileron trim tab which was a control required for that type of aircraft by its certification of airworthiness. Evidence established that this control is operated from within the control cabin by two toggle switches located on the control pedestal between the Pilot and the Copilot. On this aircraft an electrically operated trim tab is fitted to the right aileron. The tab is operated by an electric actuator controlled by a pair of switches, the switch positions being marked, "Drop Left Wing", "Off", and "Drop Right Wing", with the Left or Right designations corresponding to the right or left desired movement of the aircraft. (Console photograph not made a part of the record and Ex. D–7, Viscount Instruction Manual). The Air Carrier Manual (Ex. P–2) provides:

"Aileron tab is electrically operated and controlled by two spring-loader-

[1]. That section provides: "No person may operate an aircraft in a *careless* or reckless manner so as to endanger the life or property of another." (emphasis added). The complaint charges defendant only with operating the aircraft in a "careless" manner.

[2]. "[With exceptions not relevant to this case], no person may take off any airplane unless the following instruments and equipment are in operable condition:
"(1) Instruments and equipment required to comply with airworthiness requirements under which the airplane is type-certified. * * *"

to-center switches and a position indicator. The dual switches are provided as an additional safety feature. Both switches must be held simultaneously to operate the tab. The forward switch determines direction, and the aft switch completes a series circuit. The circuit is inoperative on emergency electrical power. Should the aileron trim control run to full travel, reduce the air speed immediately. Both pilots exerting force on the controls can maintain control at lower speeds. Land as soon as practical.",

and,

" * * * The control locks shall not be engaged in flight. Should they inadvertently become engaged, keep in mind that the trim control tabs will operate in reverse since they will then function as primary controls." (Ex. P–3.)

There was a malfunction of the aileron trim tab control which had been subjected to repair prior to the flights here in question. The nature and extent of the difficulty occasioning that repair job is not before the Court. Suffice it to say that the aircraft had been placed back on the flight line as serviceable. The fact that it had undergone repair the night before, however, was known to defendant.

On the morning of July 3, 1968, defendant completed the details of his preflight routine in the Dispatch Office and both he and the Dispatcher "signed off" the aircraft. The Captain (defendant) proceeded to the aircraft on the ramp. His First Officer, Co-Pilot had been engaged in his routine preflight activities, and upon the arrival of the Captain explained to him that the aileron trim tab switch was operating in reverse. Observation by the Captain verified that the switch, when activated to "Drop Left Wing" position, actually activated the aileron trim tab control in such a manner as would have caused the control to Drop the Right Wing, and vice-versa. The calibrated indicator needle accurately displayed the true action of the aileron trim tab but registered exactly opposite to the normal and intended function of the activating switching device. The Pilot and Co-pilot jointly determined that the aileron trim tab ran to full travel in either direction, and that the degree of trim was accurately reflected by the calibrated indicator needle. Not in dispute is the fact that the Captain and Co-pilot were in agreement that the aileron trim tab control had been cross-wired and that the reverse operation of the switch was the result of such cross-wiring. The evidence establishes that neither the Pilot nor Co-pilot were qualified by background training or experience to make such a determination, and that in fact such diagnosis was not even technically accurate.[3]

The Captain testified that he discussed the matter with Yoshiaki Nakamura who was the lead mechanic of Aloha Airlines and line mechanic servicing the proposed flight; that they observed the working of the aileron trim tab on the ground and also within the aircraft at the switches on the control pedestal; that Nakamura agreed with the Pilot and Co-pilot that it was safe to operate the aircraft in its known condition. The Co-pilot testified that he recalled seeing the Captain with Nakamura outside the aircraft, but from his own position in the cockpit could not hear their conversation, and that he could not recall whether Nakamura had been in the cockpit.

Nakamura testified that he had no recollection that the Pilot had told him of the malfunctioning of the aileron trim tab; that he had no recollection of

---

3. According to the Court's recollection, the evidence indicated that the appliance had been wired "correctly" but in accordance with the wrong blueprint, which thus caused the reverse action.

having accompanied the Pilot to the cockpit; that the flight log (Ex. P–4) does not reflect that he had taken any action as he would have been required to take had he been informed of the matter; that the Pilot's notation on the flight log (Ex. P–4) recited:

> "* * * P–F: AILERON TRIM INDICATES CORRECTLY BUT WHEN TOGGLES MOVED LEFT— RIGHT WING GOES DOWN. WHEN TOGGLES MOVED RIGHT —LEFT WING GOES DOWN * * *".

The Captain testified that "P–F" designated a pre-flight entry and accordingly fully corroborates defendant's awareness of the condition which existed prior to the aircraft's departure from Oahu. In this connection, the defendant claimed that he had fully performed all duties required of him by the Operation Manual of the Aloha Airlines, but the evidence fails to sustain his position, as this Court finds by a preponderance of the evidence. This facet of the case being analogous to "confession and avoidance," the Court finds that the burden was upon defendant to sustain this phase of the case and he has failed to so establish by a preponderance of the evidence.

■ The defendant has taken the position that the aileron trim tab actuator assembly was in an "operable condition" in spite of the fact that the control switch caused the tab to operate exactly the opposite of its intended and designated operation. He claims that he tested the operation; that the tab operated full travel in each direction; that his knowledge of the condition made it possible for him to operate the aileron trim tab in flight effectively and with no danger whatever to the lives or property of any other persons. In support of this position, the defendant, his Co-pilot on the flight, and the Senior Pilot of Aloha Airlines, who was also the representative member of the American Pilots' Association who represents the Pilots of Aloha Airlines, testified as expert witnesses. The obvious self interest of the defendant and his Co-pilot and the admissions of the Senior Pilot that as representative of the members of his Association he apparently always was expected to support the position of a member of that Association, detract substantially from the weight of their testimony, and for this and other reasons the Court is unconvinced of the soundness of their position.

Two F.A.A. Inspectors testified as expert witnesses that the equipment was not in "operable condition" as required by the Code of Federal Regulations, and both expressed the opinion that, to knowingly operate the aircraft with the aileron trim tab actuator switch functioning in reverse, was to operate the aircraft in a careless manner so as to endanger the lives and property of others. Without accepting their opinion as controlling on the merits, but taking into consideration their appearance on the witness stand, the quality of their testimony, their peculiar type of experience in investigating and enforcing the regulations as to air safety, and all other circumstances, including the policy of the law and regulations calling for the highest degree of care in air commerce, the Court finds their position to be the sounder one and controlling in this case.

The Court is particularly impressed with the fact that Commercial Aviation has long since reached its maturity without court challenge as to the specific meaning of these Federal Aviation Regulations as here involved. It seems rather reasonable to conclude further that there has been very little, if any, misunderstanding as to the meaning and interpretations placed upon the Regulations by those in aviation who are required to comply with them, or by those who seek to enforce such compliance. This case was not tried upon any application of established customs, tradition and usages, although it possibly could have been.

■ Neither the plaintiff nor the defendant has cited any court decision cov-

ering the exact issues raised, nor has the Court found any reported decision on all fours thereon. The Regulations do not define the term "careless" nor do they define the meaning of "operable condition." The Government has, as Exhibits 1 through 11 of its Trial Memorandum (R.p. 37), provided the Court with extracts of Opinions and Orders adopted by the Civil Aeronautics Board under factual situations which are analogous to the facts here presented. Without discussing these in detail, the Court has concluded that the term "operable condition" as used in Section 121.303(d) (1) of Title 14, Code of Federal Regulations means that the instruments and equipment required to comply with airworthiness requirements under which the airplane is type-certified shall be in a condition so as to operate efficiently and in the manner intended by the manufacturer. The Viscount Instruction Manual (Ex. D–7) designates the switch positions for the Aileron Trim Tab Control. In the Court's opinion the control was not in an "operable condition" when the switch positioned to "Drop Left Wing" caused the control to operate so as to "Drop Right Wing," and vice versa, and the aircraft in such condition was not in an airworthy condition.

■ Air Line operation generally requires the highest standard of care, and a commercial pilot, upon whose skill and judgment the lives and property of others are peculiarly dependent, owes at all times in the operation of the aircraft entrusted to him, the duty of exercising the highest standard of care. The Court has no difficulty whatever in reaching the conclusion that an Air Line pilot who violates what may be termed as a flight safety regulation in the operation of an aircraft designed to carry either passengers or cargo, is "careless" within the meaning of Section 91.9 of Title 14, Code of Federal Regulations.

The Court is happy to know that no injury to property or persons was caused in the present case. However, again the Court adopts the views heretofore taken by the C.A.B. in similar matters, and enunciated by their experts, as well as pointed out in the Government's memorandum, that *potential* danger to the passengers and property transported, as shown in this case, in the event of a possible combination of circumstances, wherein the correct and instant functioning of the aileron trim tab in accordance with its correct and *habitual* usage, might become critical, is sufficient to satisfy the other condition of Section 91.9 that the "careless" operation be such "as to endanger the life or property of another," in order to constitute a violation.

Because of the lack of actual injury to persons or property, and other mitigating circumstances, the Court does not believe that this case requires an imposition of the maximum sanctions prescribed by statute, but does believe that the case demands the imposition of substantial sanctions as an aid toward the enforcement of aviation safety regulations, because such regulations do and have for so many years played a very real and vital role in an activity of such major and expanding importance as aviation, and have undoubtedly contributed to the comparative safety of air travel as compared to other forms of transportation.

It is therefore ordered, adjudged and decreed that plaintiff, United States of America have judgment against the defendant, Art C. Newman, in the sum of $400.00 for each violation charged, or a total of $2,400.00, together with its costs herein.