**AIRCRANE, INC. and Helicrane Construction Corporation**

v.

**Alexander P. BUTTERFIELD, Administrator, Federal Aviation Administration, et al.**

**UNITED STATES of America**

v.

**SIKORSKY H-37 AIRCRAFT, Registration No. N7069, et al.**

**Civ. A. Nos. 73-1964, 73-2173.**

United States District Court,
E. D. Pennsylvania.

Jan. 3, 1974.

**600**

Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for Aircrane and Helicrane.

Walter S. Batty, Asst. U. S. Atty., Philadelphia, Pa., for United States.

Before VAN DUSEN, Circuit Judge, and LUONGO and BRODERICK, District Judges.

## OPINION

LUONGO, District Judge.

On August 10, 1973, regional officials of the Federal Aviation Administration (hereinafter Agency or FAA) seized a Sikorsky H–37 rebuilt military surplus helicopter owned by Aircrane, Inc. and leased by Helicrane Construction Corporation (sometimes hereinafter referred to as Aircrane, Helicrane, or Owners). That seizure gave rise to two suits. The first suit was instituted by Aircrane and Helicrane against Butterfield, et al. (Civil Action No. 73–1964) in which Owners seek a declaration of unconstitutionality of those sections of the Federal Aviation Act and regulations promulgated pursuant thereto which prohibit use of their craft for "compensation or hire," and which authorize seizure of the craft for violations of regulations without prior notice or hearing. The second suit is United States v. Sikorsky H–37 Aircraft, et al. (Civil Action No. 73–2173) in which the government seeks to collect civil penalties provided in §§ 901 and 903 of the Act (49 U.S.C. §§ 1471, 1473), and to enjoin (49 U.S.C. § 1487(a)) related corporations and certain named individuals from further operations in violation of FAA's "compensation or hire" regulations. Although the moving parties in the two actions sought preliminary injunctive relief, all parties have agreed that the two suits be heard together and that the cases be disposed of as on final hearing for permanent, rather than preliminary, injunctive relief.

Since Owners have asked to have declared unconstitutional an Act of Congress, and since their claims are not plainly insubstantial[1] this three-judge court was convened.[2] Having been so convened, the three-judge court has determined, in the exercise of its discre-

---

1. A claim is insubstantial "only if the prior decisions inescapably render the claim frivolous; previous decisions which merely render claims of doubtful or questionable merit do not render them insubstantial." Goosby v. Osser, 409 U.S. 512, 518, 93 S.Ct. 854, 859, 35 L.Ed.2d 36 (1973). The presence of alternative, non-constitutional grounds for decision do not affect the decision whether to convene a three-judge court. Florida Lime and Avocado Growers v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960).

2. 28 U.S.C. § 2282 provides:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

tion, to consider and decide related single-judge matters. Florida Lime and Avocado Growers v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960); Haining v. Roberts, 453 F.2d 1223 (5th Cir. 1971); Hobson v. Hansen, 256 F. Supp. 18 (D.D.C.1966):

The basic facts of the case are largely uncontroverted, set forth mainly by stipulation. Aircrane is in the business of purchasing military surplus helicopters, rebuilding them for civilian use, getting them licensed by the FAA and then selling them or leasing them out on a long-term basis. Helicrane is a helicopter leasing company. It leased the helicopter in question from Aircrane for the purpose of sub-leasing it on a short-term basis to industrial users, mostly construction companies, who have use for a helicopter to perform external lift work in their own businesses.

The relationship between Aircrane and Helicrane, and the relationship of the two companies to a third, Keystone Helicopter, Inc., is significant to this litigation. Keystone is a helicopter operating company, certified under FAA regulations to carry passengers and property for hire. It furnishes helicopters complete with pilots, fuel and insurance on a contract basis, both long and short term. It also operates helicopters owned by others, supplying crews and maintenance for them. Peter Wright founded and is president of all three corporations. He owns substantially all of the outstanding stock of Keystone (85%)[3] and Helicrane (90%), and although he personally owns no stock in Aircrane, he has substantial indirect control of that company through Keystone's ownership of 50% of Aircrane's stock.[3a] Michael D'Aries, the general manager and chief operating officer of Helicrane, is vice president of all three companies. The three corporations keep separate records, but they share common facilities. Keystone leases a portion of a building in West Chester, Pennsylvania, from Mr. Wright, and sublets a portion of the space to Helicrane. In that facility, Keystone employs approximately 40 persons, including several secretaries. Aircrane and Helicrane have no secretaries. Whatever secretarial help they require is furnished by Keystone's employees.

Helicrane was formed by Wright in 1968 to meet the demand of business enterprises requiring occasional helicopter service, but not enough to justify the large investment involved in purchasing a helicopter or leasing one on a long-term basis. Wright's plan was to furnish helicopter service on a lease arrangement for less than $1,000 per hour. Central to Wright's plan to furnish such low-cost service was his belief that military surplus helicopters could be certificated in what the FAA calls the "restricted category," FAR § 21.25, 14 C. F.R. § 21.25, as opposed to the "normal category," FAR § 21.21, 14 C.F.R. § 21.-21. The operational and mechanical standards that a craft seeking "restricted" certification must meet are far less stringent than those required for "normal" certification and require far less expensive testing procedures. A "restricted" craft is subject to significant operating limitations which do not constrain aircraft certified as normal. One significant limitation, the regulation involved in this case, prohibits a restricted aircraft from "carrying persons or property for compensation or hire." FAR § 91.39(b). When Wright initially made plans to seek "restricted certification," he was even uncertain that the FAA would view carriage of external loads, the basic pre-requisite for the business he envisioned, as a "special purpose operation" under FAR § 21.25[4]

---

3. Moreover, of the other 15% of Keystone's outstanding stock, half is owned in equal shares by Wright's four children, and half is owned by Wright's father.

3a. Although Hoosier Engineering Co. of Dublin, Ohio, has the right to vote 60% of the stock of Aircrane until a loan by Hoosier to Aircrane has been repaid, there is no evidence that Hoosier has exercised such right to defeat the desires of Keystone.

4. FAR § 21.25(a) provides that "an applicant is entitled to a type certificate for an aircraft

and a permissible use for a restricted aircraft. Initially FAA's New York Regional Office rejected carriage of external loads as an acceptable use of a "restricted" category helicopter, but eventually FAA made use of the discretion afforded by the broad language of FAR § 21.25(b)(7) and granted Aircrane the certificate requested on March 8, 1972.

After certification was obtained, Aircrane entered into a long-term lease of the craft to Helicrane. In the first eleven months of its lease, Helicrane entered into approximately 20 sublease agreements with industrial users, varying in length from one or two days to not more than two weeks. In its advertising and in its lease contracts, Helicrane made a point of the fact that it was not an operating company, that it did not rent the helicopter with a crew and emphasized that the lessee was obligated to furnish its own pilot and crew and to pay their salaries. Helicrane reserved the right to approve or disapprove the pilot in order to assure itself and its insurance carrier that the craft was being operated by a qualified person. In reality, however, every contractor who leased the helicopter hired as its pilot John E. Roatch, former head pilot of Keystone. Although Roatch was duly placed on the payroll of Helicrane's lessees, it is rather obvious that he, in essence, "came with the plane." [5] Frederick Carson served as Roatch's co-pilot on all the lease assignments; he was not an employee of Keystone. On every job, however, Roatch brought with him two or three mechanics who were employees of Keystone. Ground crews were furnished by the contractors who leased the aircraft.

On February 20, 1973, Wright, troubled by reports that one of his competitors had filed a complaint against him, wrote to the FAA asking for a copy of the complaint and an interoffice memo written by the FAA staff analyzing whether the complaint had merit. In the next few months, through an exchange of correspondence between Wright and FAA, it became evident that the essence of the complaint was that Helicrane's operation constituted use of a restricted aircraft for "compensation or hire," and that the FAA was in substantial agreement with the position set forth in the complaint. In responses dated June 19, June 26 and July 5, Wright, on behalf of Helicrane set forth a detailed explanation of the company's business and his analysis showing that this method of operation conformed to the regulations. The FAA did not agree. In a letter dated June 7 and in a telegram received by Helicrane on July 2, the Agency stated its belief that Helicrane's operations were illegal and asked that it cease further operations.

On July 17, the FAA sent Helicrane another letter which summarized the previous warnings and indicated that investigation had revealed that subsequent to the warnings Helicrane had entered into several more identical leases involving the carriage of external loads. The FAA noted that those facts, if confirmed, would constitute a violation of the FAA regulations and offered Helicrane the opportunity to submit "discussion or written statements" to be considered in the Agency's investigation. Representa-

---

in the restricted category for special purpose operations" if he meets certain tests. § 21.25 (b) defines "special purpose operations" to include:
  "1. Agricultural . . .
  2. Forest and wildlife conservation;
  3. Aerial surveying . . .
  4. Patrolling (pipelines, power lines, and canals);
  5. Weather control (cloud seeding);
  6. Aerial advertising . . . ; and

7. Any other operation specified by the Administrator."

5. An affidavit by an FAA official, uncontroverted by Roatch or Wright or Owners' counsel, quotes Roatch as saying "he is only the pilot and goes with whomever leases the machine." See Part III, *infra.* There was in the United States only one pilot, other than Roatch, who had a certificate to operate the type helicopter involved in this case.

tives of FAA and Helicrane arranged to meet on July 30 to discuss the problem. The meeting was postponed at Helicrane's request and was rescheduled for August 9, but prior to the rescheduled date, it was cancelled by the FAA. On August 9, Acting Director Leo J. Cardinali, in accordance with the statutory scheme spelled out in §§ 901 and 903 of the Act, issued an order to seize the helicopter as security for the $1,000 civil penalty which the FAA believed to be owing for the alleged violations.* Thereafter the above mentioned suits were initiated by the Owners and by the government respectively.

## I.

We deal first with the constitutionality of the challenged sections of the FAA Act which authorize the seizure of an aircraft for penalties for violations of FAA regulations. Preliminarily, we wish to state clearly what is in issue. As one of several alternative grounds for relief stated in their complaint, Aircrane and Helicrane argued that the contested seizure was authorized only by the regulations, and that, in this regard, the regulations conflicted fatally with a lawful statute. This argument was not renewed at trial, and properly so, in our estimation. We believe that the statute itself authorizes the seizure provision, and it is therefore the statute which is under constitutional attack. The challenged sections provide:

"Any person who violates . . . any provision . . . of this chapter or any rule, regulation, or order issued thereunder . . . shall be subject to a civil penalty of not to exceed $1,000 for each such violation. . . ."

49 U.S.C. § 1471(a)(1)

---

\* See footnote 11, *infra*.

6. "§ 13.17  Seizure of aircraft.
   (a) Under section 903 of the Federal Aviation Act of 1958 (49 U.S.C. 1473), a State or Federal law enforcement officer, or a Federal Aviation Administration safety in-

* * * * * *

"In case an aircraft is involved in such violation and the violation is by the owner or person in command of the aircraft, such aircraft shall be subject to lien for the penalty . . . ."

49 U.S.C. § 1471(b)

* * * * * *

"Any aircraft subject to such lien may be summarily seized by and placed in the custody of such persons as the Board or Administrator may by regulation prescribe . . . ."

49 U.S.C. § 1473(b)(2)

* * * * * *

"The aircraft shall be released from such custody upon payment of the penalty or the amount agreed upon in compromise; or seizure in pursuance of process of any court in proceedings in rem for enforcement of the lien, or notification by the United States attorney of failure to institute such proceedings; or deposit of a bond in such amount and with such sureties as the Board or Administrator may prescribe, conditioned upon the payment of the penalty or the amount agreed upon in compromise."

49 U.S.C. § 1473(b)(3).

The statutory scheme is straightforward. If the FAA determines that there is probable liability for a civil penalty for a violation involving an aircraft, it may summarily seize the craft to enforce the statutory lien for the civil penalty until a bond to secure payment of the penalty has been posted. The challenged regulations, particularly 14 C.F.R. § 13.17,[6] merely track and implement the statute without adding to its substance.

The issue before the court is whether this procedure passes constitutional muster in light of recent Supreme Court

spector, authorized in an order of seizure issued by the Regional Director of the region, or General Counsel of the area in which the aircraft is located, may summarily seize an aircraft that is involved in a violation for which a civil penalty may be imposed on its owner or operator."

decisions, such as Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), condemning pre-notice, pre-hearing seizures. In holding pre-judgment replevin laws unconstitutional, the Court in *Fuentes* underscored the rule that where important interests are at stake, due process demands that a "hearing be provided before the deprivation at issue takes effect:"

> "No later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred. 'This court has not . . . embraced the general proposition that a wrong may be done if it can be undone.' (Citation omitted)" 407 U.S. at 82, 92 S.Ct. at 1995.

"This is no new principle of constitutional law," 407 U.S. at 82, 92 S.Ct. at 1995, but it has been applied vigilantly by the court in recent years to safeguard substantive rights that might well have been sacrificed in an earlier era. See, *e. g.*, Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's licenses); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (garnished wages); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (father's right to custody of child).

The prior hearing requirement of *Fuentes* is not absolute; "there are 'extraordinary situations' that justify postponing notice and opportunity for a hearing." 407 U.S. at 90, 92 S.Ct. at 1999. On this basis, the Supreme Court "has allowed summary seizure of property to collect the internal revenue of the United States [Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 82, 75 L.Ed. 738 (1931)], to meet the needs of a national war effort [Central Union Trust Co. v. Garven, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403 (1921), Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604 (1921), United States v. Pfitsch, 256 U.S. 547, 41 S.Ct. 569, 65 L.Ed. 1084 (1921)], to protect against the economic disaster of a bank failure [Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947)], and to protect the public from misbranded drugs and contaminated food [Ewing v. Mytinger & Caselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), North American Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed.2d 195 (1908)]." 407 U.S. at 91–92, 92 S.Ct. at 2000. It is our task to decide whether, in the instant case, the circumstances surrounding the seizure more closely resemble the *Ewing-North American Storage* situations justifying summary action, or the *Bell-Sniadach-Fuentes* situations in which summary action was found to be constitutionally deficient. Aircrane and Helicrane argue that this summary procedure can be sustained only if all the distinguishing elements of the earlier cases are present. The *Fuentes* court encapsuled those elements as follows:

> "First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." 407 U.S. at 91, 92 S.Ct. at 2000.

In our view the Supreme Court summarized the key characteristics of a line of old cases which it desired to leave standing. However, the court did not set forth the rigid rule that all three elements were absolutely required before summary action could be upheld. Other elements, unemphasized in *Fuentes*, plainly influenced the court's decision in *Goldberg* and *Bell*. Ultimately, what is involved is a balancing of the government's interest in summary action against the property owner's interest in adjudicating his rights prior to government action. The Supreme Court acknowledged as much in *Goldberg,* quoting with approval

the D.C.Circuit's statement in R. A. Holman & Co. v. SEC, 112 U.S.App.D.C. 43, 299 F.2d 127, 131, cert. denied, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962):

> "In a wide variety of situations, it has long been recognized that where harm to the public is threatened, and the private interest infringed is reasonably deemed to be of less importance, an official body can take summary action pending a later hearing." 397 U.S. at 263, n. 10, 90 S.Ct. at 1018.

In the one case considering whether the statute challenged here squares with procedural due process, a single judge district court had no difficulty in concluding that it does. United States v. Vertol H21C, No. N8540, C–72–2101 (N.D.Cal. August 14, 1973) (slip opinion). The court there found that the "compensation or hire" provision was designed as part of a plan to effectuate the strong governmental interest expressed in 49 U.S.C. § 1303(c)—"the control of the use of the navigable airspace of the United States and the regulation of both civil and military operations in such airspace in the interest of safety and efficiency of both" —and that this governmental objective justified the conclusion that the seizure fell within the *Fuentes* "extraordinary situation" requirement. While we reach the same conclusion as the California court, it is our view that the issue merits more explication than the terse conclusion there stated.

■ As a starting point, we believe that the dangers inherent in summary governmental action impel the courts to scrutinize closely governmental interests which supposedly justify such procedures. We do not believe that the sections which are challenged as unconstitutional should be upheld simply by referring to the overriding purpose of the

Federal Aviation Act, as the court in *Vertol* appeared to do. The legitimate objectives of a statutory scheme as extensive as the FAA Act do not necessarily immunize from attack each and every section and regulation promulgated under it.[7] The inquiry here must be more precisely-honed: does the "compensation or hire" regulation further a governmental interest of sufficient magnitude that violation of the regulation justifies dispensing with the usual procedural protections, permitting summary seizure?

At the heart of the controversy between the parties is the fact that FAA regulations permit rotorcraft certificated in the standard category to carry external loads for "compensation or hire" while those certificated in the restricted category may not. This helicopter was seized for crossing the line which separates those tasks permissible for restricted craft from those which only a standard aircraft may lawfully perform.

The differences between the operational and mechanical standards which must be met by a rotorcraft seeking standard certification as opposed to a rotorcraft seeking restricted certification are substantial. This helicopter was granted restricted certification for "special purpose operation" as outlined in FAR § 21.25, 14 C.F.R. § 21.25. This section provides:

> "(a) An applicant is entitled to a type certificate for an aircraft in the restricted category for special purpose operations if he shows that no feature or characteristic of the aircraft makes it unsafe when it is operated under the limitations prescribed for its intended use, and that the aircraft—
>
> (1) Meets the airworthiness requirements of an aircraft category except those requirements that the Ad-

---

7. Moreover, it goes without saying that "[t]he establishment of prompt efficacious procedures to achieve legitimate [governmental] ends" is by itself insufficient. "The Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency . . . ." Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972).

ministrator finds inappropriate for the special purpose for which the aircraft is to be used; or

(2) Is of a type that has been manufactured in accordance with the requirements of and accepted for use by, an Armed Force of the United States and has been later modified for a special purpose. * * * "

While sub-section (a)(1) would seem to set forth a rigorous test for a craft seeking a restricted certificate, i. e., that it "meets the airworthiness requirements of an aircraft category except those requirements that the Administrator finds inappropriate for the special purpose for which the aircraft is to be used," the exceptions which the Administrator may authorize are potentially as broad as the differences between the restricted and standard categories. More important to this case, however, is the fact that the helicopter in question was originally manufactured for use by the Armed Forces, satisfying the requirements of sub-section (a)(2), and eliminating the necessity of satisfying any "airworthiness requirements." It is only necessary for an applicant to show (1) that his rotorcraft was formerly a military helicopter and (2) that it is free of particular unsafe features. Of course, even restricted certification is not granted automatically. Aircrane was required to submit a substantial amount of technical material, including all the helicopter's flight and maintenance manuals and data indicating any technical changes which the craft had undergone. The FAA also ran a check on the helicopter's safety record while used by the Armed Forces. There is nothing, however, in the regulation pertaining to restricted category aircraft requiring flight tests, whereas applicants seeking certification in most other categories must "make all flight tests that the Administrator finds necessary . . . to determine whether there is reasonable assurance that the airplane, its components, and its equipment are reliable and function properly." FAR § 21.35(b)(2).

Those rotorcraft which are certificated under FAR § 133 to conduct external load operations for compensation or hire must satisfy far more stringent tests. FAR § 133.19 provides:

"(a) The applicant must have the exclusive use of at least one rotorcraft that—

(1) Was type certificated under, and meets the requirements of, Part 27 or 29 . . .; and

(2) Complies with the certification provisions of Subpart D of this part that apply to the rotorcraft—load combinations for which authorization is requested."

Subpart D requires inter alia that the aircraft prove its airworthiness by demonstrating in an operational flight check such maneuvers as (1) pickup of the external load; (2) demonstration of adequate directional control while hovering; (3) acceleration from a hover and (4) horizontal flight at airspeeds up to the maximum for which authorization is requested. FAR § 133.41(b). These requirements alone are more stringent than those which a rotorcraft must meet to receive restricted certification. But these are merely a prelude to the multitude of tests required either by Part 27 or 29 before standard certification may be granted. A cursory examination reveals their comprehensiveness and the fact that virtually all tests—whether related to ability to climb with one engine inoperative, FAR § 27.67; general stability, FAR § 27.171; shock absorption tests, FAR § 27.723; or maximum intensities of overlapping lights, FAR § 27.1395—have as their purpose safety of the rotorcraft. Rather obviously a craft which satisfies the requirements of either Part 27 or 29 is safer for external carriage, and for all other possible functions, than one certificated under the minimal tests of FAR § 21.25, and, to their credit, Aircrane and Helicrane do not dispute that. Moreover, their counsel has conceded, at argument, that their rotorcraft does not and

could not meet the requirements for standard certification.[8]

▮ In sum, we believe that the differences between the tests required for restricted certification and those required for standard certification are formidable and are closely related to safety. There is a reasonable basis for the Agency's classification of "restricted" and "normal" certification, and for the restrictions of tasks which may be performed by the one as opposed to those which may be performed by the other. We conclude, further, that in so doing the FAA was prompted by a legitimate governmental concern for public safety.

In contrast to this substantial governmental interest, Owners have shown very little countervailing reason why summary action adversely affected their interests. Several factors which have influenced the Supreme Court's thinking in recent cases buttress this conclusion. First, unlike the situations posed in *Goldberg* or *Sniadach*, the deprivation will not significantly impair Aircrane's or Helicrane's ability to ultimately vindicate their rights. In *Goldberg*, for instance, the court was troubled by the fact that "termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits . . . [which] in turn adversely affects his ability to seek redress from the welfare bureaucracy." 397 U.S. at 264, 90 S.Ct. at 1018. There is no similar impact here from the limited seizure of the helicopter. True enough, the craft is Helicrane's major operating asset, but the restraint is relatively minor. The seizure is effective only until posting of the bond to insure payment of the penalty, the amount of which is but a very small fraction of the value of the property seized.[9]

There is no question that the helicopter's owners and others similarly situated are not unduly burdened in mounting a meaningful legal attack on the Agency's action.

Further, there is no reason to equate the summary action authorized by the statute and regulations here with hasty or uninformed action likely to be undertaken erroneously. One of the reasons due process ordinarily requires that adverse parties receive a full opportunity to present their respective positions is that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 170–172, 71 S. Ct. 624, 647, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Here, there is no similar likelihood of error. Owners were given the opportunity to, and did, inform the Agency in detail the manner in which their leasing arrangements were carried out. The trial before us adduced very little information which was not before the Agency when it made its decision. What was in dispute between Aircrane and Helicrane and the FAA was not the *particulars* of the operation, but whether or not the operation, as carried out, constituted carriage for "compensation or hire." Under the procedures outlined in the statute and regulations, there was little likelihood of a factual error of the sort which could have been avoided by a prior hearing.

The limited inconvenience visited upon Owners also influences our conclusion that the statutory scheme should be upheld. Concededly, *Sniadach* and *Fuentes* establish the proposition that

---

8. Several of the tests required for standard certification, such as those relating to fatigue evaluation, FAR § 27.571; design and construction, FAR § 27.601, et seq.; and powerplant, FAR § 27.901, would entail great financial costs which would have rendered unlikely Wright's plan to furnish low-cost helicopter service.

9. In their pleadings Owners stated that the value of the helicopter was in excess of $250,000. Helicrane's lease agreements required the lessee to insure the craft for $150,000.

even temporary deprivations of property can take place ordinarily only after notice and a hearing. However, in *Sniadach,* the individual's ability to establish his claim to his garnished wages was directly undercut by the garnishment. In *Fuentes,* while the property could be repossessed if the debtor matched the creditor's bond with one of his own, the ability of the debtor to do so was in question, and the court refused to condone a policy under which an individual of limited means would be even temporarily deprived of important household goods without hearing. In this case, however, Aircrane and Helicrane could recover the use of their helicopter by posting a bond to secure the payment of the $1,000 penalty which the FAA believed to be owing. Unlike the replevin laws struck down in *Fuentes* which required the property owner to post a bond equal to *twice the value of the goods* replevied, the bond required in the instant case to secure payment of the penalty was miniscule when compared to the value of the helicopter. The bond requirement thus has none of the onerous aspects which so troubled the court in *Fuentes.*

■ Against these reasons for upholding the seizure provisions, we balance two considerations which, under the language of *Fuentes,* do cut somewhat in Owners' favor. First, there does not appear to be present here the type of emergency such as was posed by contaminated food in *North American Storage, supra,* and second, there is some question whether the seizure here took place under a sufficiently narrowly drawn statute to insure that summary action takes place only when "necessary and justified." We conclude, nevertheless, that because of the minimal nature of the deprivation, the opportunity afforded under the regulations to present complete information to the Agency before seizure, and the opportunity to contest the Agency's claim for penalty in court after seizure, that this seizure should be upheld.

Owners argue further that even if the constitution does not demand a hearing before seizure, the Administrative Procedure Act (APA) does. Section 5 of the APA, 5 U.S.C. § 554, applies to "every case of adjudication required by statute to be determined on the record after an agency hearing . . . . " and in these cases:

"(c) The agency shall give all interested parties opportunity for—

(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment . . . and

(2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title."

The obvious answer to this argument is that the challenged sections of the FAA Act do not require "an adjudication . . . to be determined on the record after opportunity for an agency hearing." This is why the statute is constitutionally suspect in the first place. Owners have presented their argument in the alternative; on the one hand, no hearing is statutorily required, posing constitutional questions; on the other, the FAA Act, read through the APA, requires a hearing which was not granted. We have agreed with Owners that no hearing is required, but have resolved the constitutional question against them. Having concluded that the statute requires no hearing, there is no need to discuss the alternative contention, except to note that although the APA defines the content of a hearing procedure when a hearing is constitutionally or statutorily required (see Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950)), it does not independently create the right to a hearing.

We have based our decision to uphold this statutory scheme on the conclusion that the salient facts of the case justify viewing it as an exception to *Fuentes,*

in which notice and hearing may be dispensed with. We note in passing, however, that even if the *Fuentes* principles applied, we are of the view that the extended exchange of communications between Owners and the FAA *before* the seizure might well have constituted sufficient notice and hearing to satisfy due process under the circumstances.

It has become axiomatic that "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); Bell v. Burson, *supra*; Braxton v. Carlson, 483 F.2d 933, 939 (3d Cir. 1973). "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he is 'condemned to suffer grievous loss.'" Joint Anti-Fascist Refugee Committee v. McGrath, *supra*, 341 U.S. at 168, 71 S.Ct. at 647 (Frankfurter, J., concurring) quoted in *Goldberg, supra*, 397 U.S. at 262–263, 90 S.Ct. 1011. Moreover, "[a]lthough the right to some form of process may be absolute, the extent to which particular safeguards are available nonetheless varies according to circumstances. Where the consequence of error is relatively insubstantial, protection against the risk of error through the use of elaborate quasi-judicial procedures is subject to a constitutional tradeoff with the need for administrative and fiscal economy." Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L.Rev. 1439, 1454 (1968).

█ In short, if some procedural protection is afforded to a grievant, due process can be satisfied without providing a trial-type hearing, *e. g., Braxton, supra; Goldberg, supra;* particularly if the deprivation inflicted is relatively minimal. In this case, the extended correspondence between Wright and officers of the FAA (hereinbefore detailed) provided a significant opportunity for Owners to argue their contentions before the Administrator. If this exchange were unique or *ad hoc*, it

probably could not redeem a flawed statutory scheme, but the informal submission of evidence and argument, both written and oral, is mapped out by FAR § 13.15, 14 C.F.R. § 13.15. That section provides, *inter alia*:

"(b) The Administrator may compromise any civil penalty. If a civil penalty is contemplated and it is considered advisable to compromise it, the General Counsel, . . . or the Regional Counsel concerned sends a letter to the person charged with the violation, advising him of the charges against him and the law, regulation, or order that he is charged with violating, and offering to compromise the penalty. The person charged with the violation may present, to the official who signed the letter, any oral or written material or information in answer to the charges, explaining, mitigating, or denying the violation, or showing extenuating circumstances. Material or information so presented is considered in making the final determination as to probable liability for a civil penalty, or the amount for which it will be compromised."

If we were forced to decide whether the procedures set forth by FAR § 13.15 as utilized in this case satisfied due process, it would be necessary to explore at length several additional aspects of the correspondence exchange. For instance, (1) can the Agency's July 17 letter be viewed as an offer of compromise, which the regulation seems to require?; (2) does the July 17 letter, which does not give explicit notice required by § 13.15 of the right to present oral evidence, violate that regulation?; (3) does the Agency's unilateral decision to cancel the proposed meeting with Helicrane undercut procedural fairness, and the single most troubling point, (4) can the opportunity to submit written and oral evidence rise to the level of due process if the final decision is not made by an impartial decision-maker rather than someone involved in assembling the case against Aircrane and Helicrane? *Cf. Goldberg, supra;* Wong Yang Sung v.

McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950). Concluding as we do that the circumstances of this case justify viewing it as an exception to *Fuentes*, we find it unnecessary to resolve these questions. At the very least, however, the exchange of correspondence satisfies us that the FAA's seizure of Owners' helicopter was neither completely unexpected nor an act of indefensible governmental high-handedness.

## II.

We have discussed at some length the constitutionality of the statute and regulations authorizing this seizure because it is always a serious matter when an Act of Congress is attacked as unconstitutional. We do wonder, however, why Aircrane and Helicrane have devoted so much of their efforts to attacking the seizure. There is no denying that they face a potentially serious economic loss, but the loss stems, not from the seizure, the effect of which is easily neutralized, but from FAA's conclusion that their business is illegal.

The real essence of Owners' complaint is that since both restricted and standard category rotorcraft are permitted to carry external loads, it is arbitrary to deny to one category the right to carry external loads for "compensation or hire" while granting it to the other. In Owners' words, "the FAA has said that the restricted category aircraft is safe for the carriage of external loads so long as it is used in the operator's own business [but] that same aircraft cannot be used to do the exact same job if it is 'operated' for 'compensation or hire.' Stated otherwise the restricted category aircraft may properly be used by a contractor to lift an air conditioner onto a building the contractor is himself erecting but cannot be used if the contractor sought to do exactly the same job for another contractor for payment." Memorandum of Law, p. 26.

■ We agree that this is what the FAA is saying, but we find nothing startling about the proposition. It strikes us as eminently reasonable that a craft intended for commercial hire should be subjected to a higher standard of inspection than one which is privately owned and used, and that only those craft which satisfy the higher standard should be used commercially. The government agency assumes a greater responsibility when it holds out a vehicle or craft to the public as fit for commercial hire than when it approves one for private use. Far from being irrational, the distinction which Owners attack is reasonable and time-honored. It is at the heart of federal transportation regulation. For example, the Interstate Commerce Commission Act states, 49 U.S.C. § 302(a), that "the provisions of [the statute] apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce . . . ." Numerous cases have defined the sweep of that statute to reach all those who are in the business of transporting property by motor vehicle for hire, *e. g.*, B & C Truck Leasing, Inc. v. I. C. C., 283 F.2d 163 (10th Cir. 1960); I. C. C. v. Interstate Auto Shippers, Inc., 214 F.Supp. 473 (S.D.N.Y.1963); I. C. C. v. Dudgeon, 213 F.Supp. 710 (S.D.Cal.1961), cert. denied, 372 U.S. 960, 83 S.Ct. 1015, 10 L.Ed.2d 13 (1963). And in those aviation cases in which "compensation or hire" regulations were involved, the distinction seems to have been assumed, although the validity of it was not in issue. See, *e. g.*, B & M Leasing Co. v. United States, 331 F.2d 592 (5th Cir. 1964); United States v. Bradley, 252 F.Supp. 804 (S.D.Texas 1966).

## III.

We turn now to United States v. Sikorsky H–37 Aircraft, et al.[10] In this suit the government seeks to collect a civil penalty and to obtain an in-

---

10. In its libel of information, the government named as respondents Aircrane, Helicrane, Keystone, Peter Wright and John Roatch.

The government is also proceeding *in rem* against the helicopter itself.

junction against further violations of the FAA regulations.

49 U.S.C. § 1473(b)(1), provides: "Any civil penalty imposed under this chapter may be collected by proceedings in personam against the person subject to the penalty and, in case the penalty is a lien, by proceedings in rem against the aircraft, or by either method alone. Such proceedings shall conform as nearly as may be to civil suits in admiralty, except that either party may demand trial by jury of any issue of fact, if the value in controversy exceeds $20, and the facts so tried shall not be reexamined other than in accordance with the rules of the common law . . . ."

■ This section is not a model of statutory clarity. The language used in the first sentence, "any civil penalty imposed under this statute may be collected" would seem to suggest that the court's function is purely ministerial, simply providing a forum for collection of the penalty. This impression, however, is erased by the language of the next sentence which requires a proceeding resembling a civil suit in admiralty, and allows for a jury trial, if requested, on issues of fact. It is our conclusion, supported by the few cases on point, that in the court proceeding the government must prove the violation by a preponderance of the evidence and the alleged violators have the opportunity to interpose defenses. *Accord,* United States v. Newman, 331 F.Supp. 1240 (D.Hawaii 1971); B & M Leasing Corp. v. United States, 331 F.2d 592 (5th Cir. 1964); United States v. Garrett, 296 F.Supp. 1302 (N.D.Ga.), aff'd 418 F.2d 1250 (5th Cir. 1969), cert. denied, 399 U.S. 927, 90 S.Ct. 2239, 26 L.Ed.2d 792 (1970).

The uncontroverted evidence presented at trial and submitted in affidavits by Harry Bernard, Chief of FAA Flight Standards Division for the Eastern Region, and Aubrey K. Johnson, Chief Inspector for the FAA's General Aviation District Office at Teterboro, New Jersey, establishes that from December 1972 to August 1973 the corporate and individual defendants in this action used the helicopter in question on at least six occasions [11] to lift air conditioners, heating units or telephone poles for contractors. At all times the craft was licensed in the restricted category, rather than the standard category, and was therefore not authorized under the regulations to operate for "compensation or hire." On each such occasion, as previously noted, the lease provided that the construction company-lessee would take over operation of the aircraft from Helicrane, but the aircraft was piloted by John Roatch with a flight crew consisting of Keystone employees. It is clear from the evidence submitted that both Wright and Roatch had been personally informed by the FAA as early as January 1973 that it considered the operation to be contrary to regulations.

■ With virtually no facts in issue, our task is to decide only whether these operations were for "compensation or hire." We have no difficulty holding that they were. The arrangement worked out by Wright's companies was quite apparently designed to evade a valid regulation by creating the fiction that Roatch was employed by the various construction companies which subleased the helicopter. This arrangement would have been dubious enough if Helicrane had merely undertaken to recommend to its sublessees the name of an independent pilot, but given the fact that Roatch had been the chief pilot of Keystone, and given the fact that Wright controlled Helicrane and Keystone, and, indirectly, had substantial control over Aircrane, the arrangement becomes transparent. The fact is that Helicrane was leasing out helicopter, pilot and crew to perform lifting of external loads

---

11. The specific occasions were December 8 and 9, 1972, at Portage, Indiana; January 29, 1973, Secaucus, New Jersey; June 29, 1973, Dixon, Illinois; July 2, 1973, Vernon Hills, Illinois; July 9, 1973, Chicago, Illinois; August 7, 1973, Southfield, N. Y. The government seeks, however, to collect the civil penalty only for the last mentioned occasion.

for hire. Such operations completely undermine the purpose underlying the "compensation or hire" regulation and the limitations on restricted aircraft.

Although there are few precedents on point, the relevant cases indicate that the FAA has consistently maintained that such leasing arrangements violate "compensation or hire" regulations. More important, those courts considering the issue have upheld the FAA's conclusion. United States v. Bradley, 252 F.Supp. 804 (S.D.Tex.1966), was a case strikingly similar to this one. Bradley was president and chief stockholder of Aircraft Charters, Inc., which owned and leased several DC–3 and C–47 aircraft to parties seeking air service not provided by regularly scheduled commercial airlines. Although the lessee had exclusive control over what was carried, Aircraft Charters provided the pilot and flight crew, and furnished the gas, oil and maintenance for the craft. The FAA contended that Bradley and Aircraft were violating 14 C.F.R. § 121.-3(f) which provided that "no person . . . may engage in the carriage of persons or property for compensation or hire without, or in violation of a commercial operating certificate . . . ." Bradley argued that the lessees of the plane, not he or his company, were the carriers of the property. The court brushed this contention aside, concluding:

> "This well may be true as to that fraction of his business whereby he leases the plane to others who through their own pilots, crew, and facilities use it as their own for the term of the lease. However, I think the contrary is true as to his normal operation. Obviously, the purpose of the regulatory provisions is to afford the greater safety and comfort to all who fly and the carrier must meet the stipulated requirements. It is the defendant here [Bradley] who owns, operates through his employees, maintains and offers the services of the airplanes to others who should sub-mit to this regulation. He is the carrier of persons or property for hire. It is not the group of fishermen or the football team who may desire the services of the plane who constitute the 'carrier' as used in the cited regulation."

*Accord,* B & M Leasing Co. v. United States, *supra.* Although the regulation involved in the instant case is not the same as the one challenged in *Bradley,* the principles involved are indistinguishable.

■ Owners argue that the term "compensation or hire" is so vague as to be constitutionally defective. In our view, there is no such ambiguity inherent in these words which would necessitate striking down this regulation. Moreover, it appears from the evidence that the companies and the individuals involved knew before Helicrane was formed that the operation that was envisioned was at least questionable. In 1966, Keystone Helicopter Corp., through its then attorney, filed a complaint with the FAA alleging, curiously enough, that its competitor, Carson Helicopters, Inc., had used restricted category helicopters in external load configuration for compensation or hire through the subterfuge of having the pilot of the craft placed on the payroll of the construction company which needed the work done! An FAA investigation confirmed the substance of that complaint, and Carson was ordered to cease and desist from any further operation of its restricted category helicopters for commercial work. Although some of the facts of the 1966 complaint differ from those presented by this record, Wright's attorney at the time branded the placing of a pilot approved by the lessor on the payroll of the lessee "as one of the oldest dodges known to man." (See first paragraph, page 2, Exhibit D–1). Furthermore, they argue now that the regulation, the meaning of which was apparently perfectly clear to them in 1966, is unconstitutionally vague. We reject this argument.

We conclude, therefore, that the government is entitled to recover the civil penalty in the amount of $1,000. Since bond has been posted for the civil penalty, and since the government seeks to collect only from the bond, it is not necessary to discuss or decide the contention advanced by the named respondents (other than Helicrane) that they are not liable for the penalty since they did not "operate" the craft within the meaning of 49 U.S.C. § 1301(26).

Finally, the government has requested the court to issue a permanent injunction, enjoining Aircrane, Helicrane and Keystone, and the individuals, Wright and Roatch, from further operations "for compensation or hire." 49 U.S.C. § 1487(a) grants the court jurisdiction to issue injunctive relief. That section provides:

"If any person violates any provision of this chapter, or any rule, regulation, requirement or order thereunder . . . the Board or Administrator [or] their duly authorized agents . . . may apply to the district court of the United States . . . for the enforcement of such provision . . . ; and such court shall have jurisdiction to enforce obedience thereto by a writ of injunction or other process, mandatory or otherwise, restraining such person, his officers, agents, employees, and representatives, from further violation of such provision . . . and requiring their obedience thereto."

■ The facts of the instant case warrant injunctive relief as to all the named respondents except Roatch. Helicrane has engaged in continuing violations of FAA regulations, even after numerous warnings from the Agency that it was acting illegally. Uncontroverted evidence indicates that D'Aries, Helicrane's vice president, expressed Helicrane's intention to continue operating in the same fashion until stopped "by a court order." While D'Aries was prob-

ably referring generally to a judicial finding that Helicrane's operation was illegal, rather than to an injunction, it is conceivable that Helicrane might decide to regard the civil penalties as a necessary business expense and continue to operate in violation of the regulation simply by passing the penalty along to its lessees in the form of increased rates. This is clearly what the statutory injunctive provision was designed to prevent. Helicrane cannot be permitted to jeopardize the public interest which the regulations were reasonably designed to protect. Accordingly, we will enjoin Helicrane from further illegal operations.

■ From the foregoing recitation of the facts it is clear that Peter Wright is the dominant force and the one who effectively controls the operations of Helicrane as well as the other companies which have cooperated with Helicrane in the prohibited operation. For that reason, Peter Wright will likewise be enjoined. Aircrane, as the record owner of the helicopter, must also be enjoined in order to provide assurance that the helicopter will not hereafter be operated, in one guise or another, for compensation or hire. Because of its close interrelationship with Aircrane and Helicrane through Wright, the use of common facilities, and ownership of half of Aircrane's stock, Keystone must also be enjoined to make the injunction fully effective. Wright, Aircrane and Keystone are in active concert and participation with Helicrane in its operation of the Sikorsky H–37 Aircraft, Registration No. N7069, as described above.

■ No similar considerations warrant injunctive relief against Roatch, who simply piloted the craft for whoever hired him to do so. While the pilot is unquestionably essential to the operation of the helicopter, he has no power to control the purpose for which the craft may be used.