**FEDERAL AVIATION ADMINISTRA-TION and United States of America, Plaintiffs,**

v.

**M. Marshall LANDY and International Aircraft Leasing, Inc., Defendants.**

No. 77 Civ. 4292 (RLC).

United States District Court, S.D. New York.

Feb. 9, 1982.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for plaintiffs; Michael H. Dolinger, Steven E. Obus, Asst. U.S. Attys., New York City, of counsel.

Speiser & Krause, P.C., New York City, for defendant Landy; Frank H. Granito, Jr., New York City, of counsel.

Howard F. Cerny, New York City, for defendant Intern. Aircraft Leasing, Inc.

OPINION

ROBERT L. CARTER, District Judge.

On retrial on October 5, 1981, after seven days of hearings, the jury returned a special verdict by responding to numerous interrogatories posed by the court. In substance they found that between May 2, 1977, and August 2, 1977, defendants Marshall Landy and International Aircraft Leasing, Inc. ("IAL") had operated a Boeing 707, N 9985F for hire on 43 separate flights in violation of 27 Federal Aviation Administration ("FAA") regulations on each of these flights and on one flight had, in addition, failed to have life vests on the aircraft over water in violation of a 28th FAA regulation.

Pursuant to agreement of the parties, the question of penalties is presented to the court for determination without a further evidentiary hearing. This does not imply, as defendant Landy points out, that the parties waived their right to present proof and argument on this issue, but rather that they opted to submit such material to the court on papers for its consideration. The court studied and considered all the documents—the affidavits, briefs and letters—submitted by counsel in reaching its conclusions on whether and what penalties should be imposed against defendants.

The FAA regulations are designed to insure safety in air space, 49 U.S.C. § 1421(a), and are clearly in the public interest. *See, e.g., Doe v. CAB,* 356 F.2d 699, 701 (10th Cir.1966). It is established on this

record beyond question that defendants chose to ignore the FAA's regulatory scheme on the theory that theirs was not a Part 121 operation for hire but was a private operation as defined by Part 91. Defendants, however, neither sought to bring their operational activities to the attention of FAA authorities for a determination as to whether Part 121 or Part 91 controlled their functions, nor did they apply for an FAA commercial operator's operating certificate. Under the circumstances, defendants operated at the risk that the violations attributed to them would be found. The commercialization of defendants' activities, their extensive aviation experience, their necessary familiarization with FAA regulations and the fact that the operations involved fall squarely within Part 121 make it impossible for the court to conclude other than that the violations were both deliberate and willful and in contemptuous disregard of the FAA and its regulations.

■ The United States' airways are crowded. Failure to comply with regulations relating to training of personnel, equipment, facilities and operational procedures poses a serious public hazard. The FAA has limited resources and cannot oversee all the aircraft using the nation's airways to determine whether all are in compliance with FAA procedures. It must depend largely on voluntary adherence to the rules it promulgates. The system has undoubtedly worked well because the safety of all those operating in or using the airways is at stake. While there is no evidence of an actual danger to public safety on any flight in which defendant bypassed the FAA regulations, that fortunate happenstance is totally irrelevant. The violations trenched broadly on all the substantive requirements for commercial operations designed to insure public safety and were in cavalier contempt for the regulatory system itself. Since there can be no issue here of mistake or inadvertence, at the very least, these violations require sanctions as a guard against similar violations by others in the future.

Landy's involvement is clear. Henry Wharton and the latter's Air Transport Company were Landy's agents and supplied the air crews for all the flights involved in this litigation. Wharton found the 707 for Landy and accompanied Landy to Germany to purchase the aircraft and returned with Landy when the aircraft was brought from Germany to Miami. He supervised the refitting of the 707 for the carriage of cargo, oversaw its maintenance, and was responsible for the preparation of the inspection program for the aircraft. He acted for Landy in seeking out business for the plane; he found and negotiated with IAL for lease of the aircraft and delivered the plane to IAL in New York. While the plane was on lease to IAL, Wharton supplied the crew, was in contact with crews either from Miami or New York and assured availability of maintenance facilities in Europe. When Landy terminated the IAL lease, Wharton was sent to New York to notify IAL, and when Landy sought to repossess the plane, Wharton was delegated to do that. Wharton ran the aircraft operation under Landy's instructions and was to receive a share of any profits Landy made in the enterprise.

Moreover, Air Transport was listed as the buyer of the aircraft from Lufthansa, although Landy supplied the money for the plane. Wharton used Landy's office to transmit Air Transport business which included contacting crews, all of which were supplied through Air Transport. The crews were paid in checks signed by Landy's secretary and when the plane was leased to Nicaragua National Airlines, Wharton supplied the crews.

Landy has been in the aircraft leasing business for some 25 years. He bought the aircraft for a business venture and all the facts pointed to a partnership or close business relationship between him and Wharton in this regard. Yet, throughout this proceeding Landy has sought to blur his involvement including giving perjured testimony. From his testimony on the witness stand one would have concluded that he and Wharton were casual acquaintances. He professed only the vaguest knowledge of

Air Transport or of Wharton's activities and yet the evidence had established that Wharton used Landy's offices and secretary regularly to conduct Air Transport business. The jury obviously did not believe him and found him liable for transgression of FAA regulations. His testimony is surely evidence of bad faith and is so assessed for the purpose of determining whether sanctions should be imposed.

Wharton and Air Transport were Landy's agents. Through them Landy maintained operational control of the aircraft in particular by supplying the crews. He operated knowingly in willful violation of the regulations.

IAL is similarly guilty of knowing and intentional disregard of applicable FAA regulations. John Burns, the principal of IAL, had first operated Burns Aviation. At that time FAA had found his activities in violation of Part 121. He had been advised of Part 121 requirements and warned that it would be impossible for cattle shippers with no aviation background to maintain operational control of an aircraft.

The manager of Stewart Airport testified in regard to the instant litigation that all charges related to the maintenance and operation of the 707 were billed, on IAL's instructions, to IAL and J.D. Smith and never to the shippers. While the sub-lease agreements recite that the shippers were solely responsible for the aircraft and maintained "full and exclusive possession, use and control" of the aircraft (Govt. Ex. 7–14), Burns knew the shippers were not involved in any material way in the operation of the aircraft. On the contrary, Burns supervised the day-to-day operation of the aircraft. Accordingly, IAL committed a knowing violation of Part 121.

There is no doubt of Landy's capability of paying. He purchased three Boeing 707's for half a million dollars and is, according to his counsel, a man of considerable wealth.

IAL and Burns Aviation are no longer in operation. IAL, however, did make considerable profits, and although the full amount is not revealed in the record of this trial, Gov't Ex. 13 shows that IAL could have earned as much as $60,000 on any one of the flights involved in the litigation.

The Federal Aviation Act makes it unlawful for any aircraft to use airspace in violation of FAA regulations, 49 U.S.C. § 1430(a)(5). Each person guilty of violating the regulations may be fined up to $1,000 per violation. 49 U.S.C. § 1471(a)(1). The court is empowered to set the penalty when violations have been established. *United States v. Duffy,* 550 F.2d 533, 534 (9th Cir.1977). The controlling considerations in determining the civil penalty are the scope and seriousness of the violations, whether the party acted in good faith and his ability to pay. *United States v. J.B. Williams Co.,* 498 F.2d 414, 438 (2d Cir. 1974).

Public interest in safety in the air is too great to permit less than vigorous and firm sanctions against those who deliberately and knowingly and in bad faith disdain compliance with the regulations, as was done here. Defendants also meet the third criterion—ability to pay the fine imposed. Thus civil penalties will be assessed.

The jury found that 43 flights for hire had been made without compliance with Part 121 requirements and that a total of 1,162 violations had occurred on these flights. The government urges that a penalty of $500 per violation be imposed on Landy for a total civil penalty of $581,000 and $250 per violation be imposed on IAL for a total civil penalty of $290,500. Defendants urge that no penalty be imposed.

The jury found 43 flights by counting as a separate flight each take off and landing, even though a leg of a continuous journey which terminated at some further destination. While I have no quarrel with the jury's determination as to the number of flights, for the purpose of imposing civil penalties, however, the leg of a continuous trip will not be counted as a separate flight. Based on that formula, 28 flights will be counted for the purpose of assessing sanctions against defendants as follows: (1)

May 2, 1977, Stewart Airport ("Stewart") to Budapest, Hungary; (2) May 6, 1977, Stewart to Budapest; (3) May 8, Stewart to San Juan; (4) May 9, Stewart to Budapest; (5) May 10, Stewart to Belgrade, Yugoslavia; (6) June 3, San Jose, Costa Rica to Caracas, Venezuela; (7) June 7, Stewart to San Juan; (8) June 7, Stewart to San Juan; (9) June 8, Stewart to San Juan; (10) June 10, New Orleans to San Salvador, El Salvador; (11) June 11, New Orleans to San Salvador; (12) June 13, Stewart to Budapest; (13) June 19–20, Stewart to Leipzig, East Germany; (14) June 21, Stewart to Budapest; (15) June 22–23, Stewart to Budapest; (16) June 25, Stewart to San Juan; (17) June 26, Stewart to San Juan; (18) June 26–27, Stewart to Zagreb, Yugoslavia; (19) July 10, Managua, Nicaragua to Caracas; (20) July 11, Managua to Caracas; (21) July 11, Managua to Caracas; (22) July 12, Managua to Caracas; (23) July 14, Managua to Caracas; (24) July 15, Managua to Caracas; (25) July 15–16, Stewart to Mashdad, Iran; (26) July 18–19, Bucharest, Rumania to Los Angeles; (27) July 20, Stewart to Zagreb; (28) August 1–2, Hanover, West Germany to Stewart.

■ On each flight, the jury found some 27 violations. Accordingly, the court will impose civil penalties for 756 violations and assesses against Landy a penalty of $500 for each violation for a total civil penalty of $378,000, and assesses against IAL a penalty of $250 for each violation for a total civil penalty of $189,000.

SETTLE ORDER.