**FEDERAL AVIATION ADMINISTRATION and United States of America, Appellees,**

v.

**M. Marshall LANDY and International Aircraft Leasing, Inc., Appellants.**

**Nos. 448, 455, Dockets 82–6132, 82–6162.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 16, 1982.

Decided April 11, 1983.

OAKES, Circuit Judge:

M. Marshall Landy and International Aircraft Leasing, Inc. (IAL) appeal from a judgment imposing civil penalties of $378,-000 against Landy and $189,000 against IAL for violations of safety regulations promulgated under the authority of subchapter VI of the Federal Aviation Act, 49 U.S.C. §§ 1421–32 (1976 & Supp. IV 1980). The United States District Court for the Southern District of New York, Robert L. Carter, Judge, entered the judgment after a jury returned special verdicts finding by a preponderance of the evidence that Landy and IAL both operated a Boeing 707 for compensation or hire on forty-three separate flights from May 2, 1977 to August 2, 1977.[1] Each flight violated twenty-seven Federal Aviation Regulations (FARs); one flight violated twenty-eight FARs.[2] The factual

Frank H. Granito, Jr., Speiser & Krause, P.C., New York City (John J. Halloran, Jr., Speiser & Krause, P.C., New York City, on brief), for appellant M. Marshall Landy.

Howard F. Cerny, New York City, for appellant Intern. Aircraft Leasing, Inc.

Steven E. Obus, Asst. U.S. Atty., S.D. N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Michael H. Dolinger, Thomas D. Warren, Asst. U.S. Attys., S.D. N.Y., New York City, of counsel), for appellees.

Before OAKES, VAN GRAAFEILAND and MESKILL, Circuit Judges.

1. This trial was the second in this case. This court reversed and remanded the first judgment because of defects in the jury interrogatories, particularly the failure to have the jury determine which violations occurred during which flight. *Landy v. FAA,* 635 F.2d 143, 145–47 (2d Cir.1980).

2. By special interrogatories, the jury found the following violations of Federal Aviation Regulations (FARs), 14 C.F.R. Part 121: (1) engaging in the carriage of property for compensation or hire in air commerce without a commercial operator operating certificate, FARs 121.3(f) and 121.45(a); (2) engaging in the carriage of property for compensation or hire in air commerce without FAA-issued operations specifications, FARs 121.3(f), 121.43, and 121.45(b); (3) failure to inform employees of portions of the operations specifications applicable to their duties and responsibilities, FAR 121.75(a); (4) failure to conduct 50 hours of proving tests, FAR 121.163(a); (5) failure to demonstrate to the FAA ability to carry out aircraft ditching procedures, FAR 121.291(d); (6) extended overwater operation without a life preserver on board the aircraft for each occupant, FARs 121.303(a), (d) and 121.339(a)(1) (one flight found to violate these FARs); (7) operation without regular inspection of the airplane's emergency equipment, FAR 121.309(b)(1); (8) extended overwater operation without clearly identified emergency equipment, especially a life raft, marked to indicate its method of operation, FARs 121.309(b)(3) and 121.339(a)(2); (9) take off without first-aid equipment, FAR 121.309(b), (d); (10) take off without having provided aircraft crews with an approved cockpit check list procedure, FAR 121.315(a); (11) operation without an approved cockpit check-list readily usable in the cockpit, FAR 121.-315(c); (12) operation without an approved flight recorder, FAR 121.343; (13) operation without a working cockpit voice recorder, FAR 121.359; (14) operation without a ground proximity warning-glide slope deviation alerting system, FAR 121.360; (15) failure to prepare and keep current a manual for the use and guidance of flight, ground operations, and management personnel, FARs 121.133, .135; (16) failure to furnish manuals as required, FAR 121.137; (17) failure to have appropriate parts of the manual on the airplane, FAR 121.139; (18) failure to maintain the airplane in accordance with the maintenance portion of the manual, FAR 121.369(b); (19) failure to include a chart or description of the maintenance organization in an operator's manual, FAR 121.-369(a); (20) failure to establish and maintain a system for continuing analysis and surveillance of the performance and effectiveness of the inspection and maintenance programs, FAR 121.373(a); (21) failure to have a training program for personnel performing aircraft maintenance, FAR 121.375; (22) failure to assign each crew member specific functions to perform in emergency situations, FAR 121.397(a); (23) failure to include the emergency functions assigned to each crew member in the manual, FAR 121.397(b); (24) failure to establish a training program for all crew members and airplane dispatchers, FARs 121.401(a), .403; (25) failure to obtain FAA approval of the training program, FAR 121.405; (26) use of pilots in command of the airplane, who had not passed a line check within the preceding year, FAR 121.440; (27) use of pilot flight crew members who had not completed proficiency checks within the preceding year, FAR 121.441;

and legal defense was that the plane's operations did not make Landy and IAL subject to these regulations, found in 14 C.F.R. Part 121, because Landy and IAL were not commercial operators of the Boeing 707, but rather subleased it to customers who operated it. On appeal, they challenge the sufficiency of the evidence on this point. Additionally, they challenge procedural and evidentiary rulings, the court's charge to the jury, and the scope of the sanctions.[3] We hold that the jury's findings of fact were neither clearly erroneous nor affected by an erroneous charge; that the trial judge neither erred as a matter of law nor abused his discretion in the rulings; and that the calculation of fines was correct, and we therefore affirm the judgment.

## I. The Regulatory Scheme

The Federal Aviation Administration (FAA) has authority to promote aircraft safety by regulation of civil aircraft in air commerce. 49 U.S.C. § 1421(a). Any operation that "directly affects, or which may endanger safety in, interstate, overseas, or foreign air commerce" is included in the definition of air commerce. 49 U.S.C. § 1301(4). Pursuant to general statutory authority, the Administrator of the FAA has issued extensive rules, regulations and minimum standards designed to enhance the safety of civil aeronautics. *See generally* 14 C.F.R. Parts 1–199.

Of particular relevance to this case are two portions of those regulations, Part 91 and Part 121. Part 91 sets forth "general operating and flight rules" for "the operation of aircraft ... within the United States" and, with limited exceptions, for the operation of "civil aircraft of U.S. registry outside of the United States." 14 C.F.R. § 91.1(a)–(b). In addition to these rules of general applicability, the FAA has promulgated a far more extensive and stringent set of rules for certification and operation of aircraft for what is commonly considered commercial aviation.[4] Part 121 applies to two types of aviation: (i) air carriers, 14 C.F.R. § 121.1(a)(1)–(4), and (ii) commercial operators when they engage "in the carriage of persons or property in air commerce for compensation or hire." 14 C.F.R. § 121.1(a)(5). This case concerns the second of these two categories.

The statute provides that "[a]ny person who causes or authorizes the operation of the aircraft, whether with or without the right of legal control (in the capacity of owner, lessee, or otherwise) of the aircraft, shall be deemed to be engaged in the operation of aircraft" within the meaning of the Federal Aviation Act. 49 U.S.C. § 1301(31) (Supp. IV 1980). A "commercial operator"

---

(28) failure to comply with flight route and airport familiarity certification for pilots, FARs 121.443, .445.

**3.** For the purpose of imposing civil penalties, the court chose to count each complete flight (twenty-eight flights), rather than each leg of a continuous itinerary as a separate flight (forty-three flights), as the jury had done.

The final judgment imposed half the statutory maximum civil penalty for each of Landy's violations and one quarter the statutory maximum civil penalty for each of IAL's violations, awarded costs to the Government, and enjoined the defendants from operating a large aircraft for compensation or hire without complying with Federal Aviation Administration regulations. Judge Carter's opinion is reported at 16 Av.Cas. (CCH) 18,165 (S.D.N.Y. Feb. 9, 1982).

**4.** At the time of the events in this case, the applicability of the more stringent commercial aviation safety regulations, FARs Part 121, depended on resolution of a threshold economic question: "Where it is doubtful that an operation is for 'compensation or hire', the test applied is whether the carriage by air is merely incidental to the person's other business or is, in itself, a major enterprise for profit." 14 C.F.R. § 1.1 (defining "commercial operator"). For reasons developed in our opinion, we find that Landy and IAL were commercial operators.

The Federal Aviation Administration has since enacted further certification and operating regulations for airplanes with a maximum payload capacity of 6,000 pounds or more or seating capacity of 20 or more. 14 C.F.R. Part 125 (1982). Thus, the issue of who maintains operational control of the airplane during a sublease, the question that involved juries in two trials and circuit judges in two appeals, is of diminished significance in the aviation world today.

is defined by its ordinary meaning.[5] Operators for compensation or hire must obtain FAA approval.[6] Together with an operating certificate, 14 C.F.R. § 121.3(f), they must also obtain operations specifications, which determine such matters as the type of operations authorized, areas of operation, time limits for inspections and overhauls, airport authorizations and limitations, and weight and balance requirements for the aircraft. 14 C.F.R. § 121.45(b). To obtain a certificate and operations specifications, operators must demonstrate to the FAA their ability to comply not only with their terms, but also with the other regulations of Part 121 applicable to operations for compensation or hire. These regulations go to such varied matters as qualifications and training of maintenance and flight personnel, equipment required in the aircraft and on the ground, and preparation of detailed manuals governing inspection, maintenance and operation of the aircraft.

Under the Federal Aviation Act, noncompliance may result in revocation of certification, 49 U.S.C. § 1429, civil fines, *id.* § 1471, or criminal penalties, *id.* § 1472. Failure to comply with any of the applicable regulations subjects a person to civil penalties "not to exceed $1000 for each such violation;" each day of continuing violations is a separate offense. 49 U.S.C. § 1471(a)(1). *See* 49 U.S.C. § 1430(a)(5) (prohibiting operation of aircraft in air commerce in violation of FAA rules, regulations, or certification). Collection of such penalties is ordinarily by civil suit against the violator, 49 U.S.C. § 1473(b)(1), and either party may demand a trial by jury "of any issue of fact" that has not previously been determined in an administrative hearing. *Id.*[7]

## II. Operation of the Aircraft

Landy bought a Boeing 707 from a German airline in 1976. The plane was converted to carry cargo. Landy and IAL executed a one year lease agreement on April 28, 1977. Between May 2 and August 2, 1977, IAL entered into a series of subleases. Most of these subleases, operating out of Newburgh, New York, involved transportation of livestock to foreign airports. On occasion, the plane was ferried by an American crew to a foreign airport, and these crews flew seven trips between foreign airports. A typical sublease contract stated that the shipper-lessee would have

> full and exclusive possession, use and control of the Aircraft, shall have the sole responsibility for operation, use and control, for pilot assignment and direction, and for all other aspects of utilization of the Aircraft. Lessee shall obtain from a reputable aircraft service company or employ directly properly certified crew members ... [who] shall be under the complete supervision, direction and control of Lessee and not in any way under the supervision, direction or control of or in any way responsible to Lessor.

5. " 'Commercial operator' means a person who, for compensation or hire, engages in the carriage by aircraft in air commerce of persons or property, other than as an air carrier or foreign air carrier or under the authority of Part 375 of this Title...." 14 C.F.R. § 1.1.

6. The appellants contend that the FAA may not issue or require operating certificates that are "other than ... air carrier" or airport operating certificates, and thus that FAR 121.3(f) lacks legislative authority and FAR 121.4 conflicts with congressional intent. But the statute is plainly broad enough to empower the FAA to regulate commercial operators. 49 U.S.C. § 1421(a)(6); *see* discussion *supra.* There is a history of such enforcement. *See, e.g., B & M Leasing Corp. v. United States,* 331 F.2d 592 (5th Cir.1964) (per curiam); *United States v. Bradley,* 252 F.Supp. 804 (S.D.Tex.

1966). The legality of this authority is furthermore the law of this case. *Landy v. FAA,* 635 F.2d at 147–48.

7. Before the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705, a party could demand a jury trial of any issue of fact regardless of whether there had been an agency hearing on the issue of regulatory violations and penalties. As amended, 49 U.S.C. § 1473(b) (Supp. IV 1980), allows trial de novo only of facts not previously determined in the administrative hearing. *See* H.R.Conf.Rep. No. 1779, 95th Cong., 2d Sess. 117, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3737, 3773, 3817–18. The amendment, even if it were applicable to these 1977 events, would not change the procedural history of this case, because there was no administrative hearing.

Thus, at all times, Landy and IAL operated in form as if the plane were leased to the cargo shipper who controlled its operation, bringing the flights under the General Operating Rules, 14 C.F.R. Part 91. The jury, however, found that Landy and IAL retained control of the flights, which were operated for compensation, and should therefore have complied with the stricter certification, inspection and maintenance requirements of 14 C.F.R. Part 121.

A. *Landy.* The link between Landy and operational control of the plane is Henry Warton, president of Air-Trans Ltd., an entity the jury apparently concluded was a shell company for Landy.[8] Warton told Landy in the summer of 1976 that Lufthansa was interested in selling the aircraft. Warton brought the Lufthansa representative to Landy to negotiate the sale, went to Germany to complete the paperwork, accompanied the plane back to Miami where he supervised its refitting from passenger to cargo configuration, and supervised the preparation of an inspection program and application for airworthiness certification by the FAA. Warton then found a party willing to lease the plane. He negotiated the IAL lease under which the plane operated during the three-month period at issue here, and delivered the plane to IAL at Stewart Airport in New York State. Warton notified IAL in August 1977 that Landy was terminating the lease, repossessed the plane for Landy several weeks later, and then supervised the operation of various of Landy's aircraft both directly for Landy and under lease to other parties. Indeed, because Warton was to receive twenty-five percent of Landy's profits from operation of the aircraft for his services as broker on the original sale, the jury could have concluded that Landy and Warton were joint venturers.

Warton's company, Air-Trans Ltd., supplied all the crews for all the subleased flights. Air-Trans appeared as transferee on the bill of sale when Landy purchased the aircraft from Lufthansa and authorized the work order for inspection of the aircraft in Florida. Moreover, Air-Trans had no office of its own. Warton conducted Air-Trans' business from Landy's office, including the payment of crew members for the aircraft and, frequently, supervision of the crews when they conducted overseas flights. Landy's secretary signed all the Air-Trans checks paying crew members for their services.

B. *IAL.* The link between IAL and operational control of the plane is J.D. Smith Inter-Ocean, Inc. (J.D. Smith), the company serving as IAL's exclusive sales agent.[9] IAL relied on the terms of the sublease agreements to prove that IAL was not responsible for operation of the aircraft. The evidence, however, indicated that IAL and J.D. Smith performed virtually all of the functions necessary to operate the aircraft, and the shippers were almost entirely excluded from any responsibility for the aircraft or its operation. A shipper would ask the air export manager of J.D. Smith to arrange for shipment of cargo. The manager would then send a sublease agreement prepared by IAL. At the same time, the manager obtained from IAL the cost charged by IAL for the flight, and from Air-Trans the cost of the crew, and would inform the shipper of the total cost. The shipper was responsible only for delivering the cargo to the airport when IAL specified that the plane would be ready. IAL provided maintenance, fuel and all auxiliary services for the plane, either directly or through airport personnel, who billed IAL or J.D. Smith, not the shipper. J.D. Smith supplied

8. Air-Trans Ltd., a Bahamian corporation listed as a defendant in the action, apparently was not served with the Government complaint. The first trial proceeded against Landy, IAL, and J.D. Smith. *FAA v. Landy,* 635 F.2d at 145.

9. J.D. Smith acquired an exclusive sales agency in exchange for lending IAL $10,000 to help pay for the lease of Landy's plane. Following the first trial, *see* note 1 *supra,* the court entered judgment against J.D. Smith in the amount of a $20,000 civil fine. J.D. Smith entered into a stipulation of settlement with the Government in September, 1979, under which the court entered an amended judgment imposing civil penalties and enjoining J.D. Smith from future violations.

animal storage equipment, refitted the plane for each cattle-carrying flight, and disbursed the shipper's lump sum payment to Air-Trans (for the crew) and to IAL (for the other costs of operation).

The language of the subleases notwithstanding, the jury could conclude that IAL, by handling the shipping arrangement and payments directly and through J.D. Smith, as well as Landy, by supplying the aircraft and, through Warton and Air-Trans, the crews, had control of the plane. The facts support the jury's finding that IAL and Landy both operated the plane for compensation or hire, and therefore that IAL as well as Landy should have complied with Part 121 of the Federal Aviation Regulations governing commercial operators.[10] Courts evaluating relationships similar to those here have looked beyond the form of contractual agreements to the substance of actual aircraft operations, sanctioning those who effectively operate an aircraft for compensation or hire in violation of FAA safety regulations. *See e.g., Aircrane, Inc. v. Butterfield,* 369 F.Supp. 598, 601–03, 611–13 (E.D.Pa.1974) (three judge court); *United States v. Bradley,* 252 F.Supp. 804, 805 (S.D. Tex.1966). The evidence at trial was clearly sufficient to support the jury's finding that Landy and IAL operated the aircraft for compensation or hire and were therefore subject to Part 121 safety regulations. *See United States v. Ozark Air Lines, Inc.,* 419 F.Supp. 795, 799 (E.D.Mo.1976); *United States v. Garrett,* 296 F.Supp. 1302, 1304 (N.D.Ga.) (liability for civil penalties by preponderance of the evidence), *aff'd,* 418 F.2d 1250 (5th Cir.1969) (per curiam), *cert. denied,* 399 U.S. 927, 90 S.Ct. 2239, 26 L.Ed.2d 792 (1970).

C. *The Jury Charge.* Appellants also assert that the trial court's charge on operational control was erroneous, and tainted the jury's verdict. The Special Verdict form asked as to Landy and IAL: "Do you find by a preponderance of the evidence that defendant . . . operated the aircraft for compensation or hire?" Landy and IAL first argue that the phrase "operated the aircraft" does not match FAR 121.3(f) which specifies that "[n]o person . . . may engage in the carriage of persons or property for compensation or hire in air commerce without, or in violation of a commercial operator operating certificate and appropriate operations specifications issued under this part." We note first that the trial judge did use the regulation's language ("engage in") in instructing the jury. Second, the violation requires no finding of intent, and we fail to see how the jury would have been misled by the semantic distinction between "to operate" and "to engage in."

Landy and IAL additionally argue that two instructions, which we set out in the margin,[11] misstated the law. *Aircrane*

---

10. Appellants also argue that even if the shippers did not have operational control, the operator must be deemed to be Air-Trans Ltd., a Bahamian corporation and thus a foreign operator subject to 14 C.F.R. Part 129 rather than Part 121. But Landy, not Air-Trans, was found to have operated the plane for compensation or hire. Moreover, Part 129 does not apply unless the foreign air carrier holds a permit issued by the Civil Aeronautics Board under 49 U.S.C. § 1372. Air-Trans Ltd. was not such an air carrier, *see* 49 U.S.C. § 1301(3), (10), (23) (1976 & Supp. IV 1980), and had never acquired a CAB permit. Moreover, the parties briefed and argued this issue on the first appeal. This court implicitly rejected the argument in its reversal on other limited grounds. *See Landy v. FAA,* 635 F.2d at 147–48.

11. I have already explained the statute and the regulations to you and told you that the operation of an aircraft hinges on control, direction and responsibility for its operations. I now instruct you that where a lessor and/or its agent undertakes to recommend to its sublessees flight crews which are identical for each lease and for each operation, such fact is probative on the question of whether the lessor and/or agent shifted operational control of the aircraft to the sublessee.

It is also the law that where an aircraft and crew for the transportation of a shipper's cargo is furnished by different parties but the supplier of the plane and the supplier of the crews are related in some way, and the net effect of these acts is to leave responsibility for the operation of the aircraft in the lessor and/or the person furnishing the crew, and the flight crews exercise complete control over the aircraft, then the lessee does not operate the aircraft.

*v. Butterfield, supra,* 369 F.Supp. at 611–12, is, however, adequate authority for an instruction that recommendation of crews is probative on the question of operational control. Every flight employed an Air-Trans crew, and the jury could reasonably infer that the crews came with the plane. The second challenged instruction is little more than a truism; Landy's counsel agreed that if the lessor and the crew supplier keep operational control, then the lessee does not. Further, the instruction is supported as a matter of law by *Shaffer v. Golden Eagle Aviation, Inc.,* 1 NTSB 1028 (Jan. 6, 1971). Finally, IAL claims error in the court's failure to charge on agency. Agency, however, was not an element of the complaint, and was not in issue. The court properly charged on operational control. In sum, we have examined the contention that the court's charge erroneously led the jury to its key finding on Landy's and IAL's role, and find the arguments insubstantial.

■ D. *Evidentiary Rulings.* Appellants objected to exclusion of opinion testimony by one witness, a former FAA District Office Supervisor, who would have testified as to industry practice and FAA policy concerning operational control of a leased aircraft under Part 91, as reflected in Advisory Circulars. The testimony was properly excluded for two reasons. First, questions soliciting the former FAA employee's understanding of the meaning and applicability of Part 91 and Part 121 FARs would invade the province of the court to determine the applicable law and to instruct the jury as to that law. *See, e.g., United States v. Ingredient Technology Corp.,* 698 F.2d 88 at 96–97 (2d Cir.1983) (tax evasion); *Marx & Co. v. Diner's Club, Inc.,* 550 F.2d 505, 509–12 (2d Cir.) (contracts), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). Second, industry practice and FAA policy (apparently suggesting that others operated aircraft for "meat hauling" under Part 91 rather than Part 121) were irrelevant to the jury's determination of violations of the regulations, which requires no finding of intent. *Compare* 49 U.S.C. § 1471 (civil penalties for any violation)

*with* 49 U.S.C. § 1472 (criminal penalties, requiring proof of knowing and willful violation). If the testimony had been offered to show good faith confusion as to applicability of Part 91 regulations to this type of aircraft leasing, the testimony would be relevant to the sanction issue, *see, e.g., United States v. Bradley, supra,* 252 F.Supp. at 805–06, but this was not an issue of fact for jury consideration.

■ For the same reason of relevancy, the court properly excluded warning letters to the plane's flight crews, which defense counsel would have offered to show that the violations were deemed by the FAA not to be serious, or not to involve a threat to safety. The issue of seriousness of the violations, like the issue of good faith confusion, goes to the scope of the penalties imposed. Imposition of penalties is committed to the court, not the jury. *United States v. Duffy,* 550 F.2d 533, 534 (9th Cir.1977) (per curiam). The court did receive all this evidence in Landy's post-trial papers submitted on the question of penalties.

■ IAL objects on grounds of unfair surprise to the admission of testimony of the FAA Regional Counsel, who was not listed as a Government witness, but was nonetheless called as a rebuttal witness. The substance of his testimony came as no surprise, because he had testified at the first trial. *See* note 1 *supra.* Further, even though the government had indicated that it was not going to call this witness, it was proper to do so in rebuttal and impeachment of IAL's president's testimony that he had been assured by the FAA that his operation was proper.

■ Two other evidentiary rulings on the issue of operational control are raised on appeal. The Government was allowed, over a hearsay objection, to put in evidence a telex sent by the German government through the State Department to the FAA. The telex went to rebut the testimony of a shipper that in order to get landing rights, he had satisfied the German government that a flight from Germany to New York

was not a commercial operation. The telex informed the Government that Germany would not permit the aircraft to enter German air space in the future because it had been operated on that flight without approval by the German government. The telex was identified by the FAA inspector to whom it had been sent. As a statement by a foreign government to the federal government, incorporated in the FAA's factual findings resulting from an investigation made pursuant to authority granted by law, the telex was admissible as a public record and report under Fed.R.Evid. 803(8)(B), (C). *See United States v. Grady,* 544 F.2d 598, 604 (2d Cir.1976).

### III. The Flights

If the jury found by a preponderance of the evidence that Landy and IAL operated the plane in air commerce for compensation or hire, the next step was to identify the flights. Landy and IAL raise three issues here.

█ A. *The Flight List.* Violations of FARs occur when an aircraft is in operation. Further, the civil penalty scheme of the Federal Aviation Act makes each day of continuing violations a separate offense. The Government therefore put in documentary as well as testimonial evidence (such as the plane's log book and pilot's deposition) from which the jury could find as fact that specific flights had occurred. The court permitted a list of these alleged flights to accompany the jury, and Landy objects because the list was never offered in evidence. At trial, however, his objections were different. He successfully objected to the inclusion of references to exhibits or testimony purporting to establish each flight. He unsuccessfully objected to including flights that were not alleged in the Government's pleadings. Under the Federal Rules, however, when issues "not raised by the pleadings are tried by express or implied consent of the parties," the pleadings are, in effect, amended. Fed.R.Civ.P. 15(b). If Landy and IAL felt that admitting evidence as to those flights prejudiced their defense on the merits, the appropriate response would have

been to move for a continuance. *Id.* As to the grounds raised here for the first time, we simply note that Judge Carter stated that the list "contains the dates and flights on which the government alleges that there were violations; some 43 are listed." So far as we can see this was a perfectly proper aid to the jury in its deliberations on a factual issue. *Compare First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1315 (5th Cir.1977) (court permissibly gave jury written outline of elements necessary to convict defendant), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978) and *Shane v. Warner Manufacturing Corp.,* 229 F.2d 207, 209–10 (3d Cir.) (court permissibly gave jury written computation of damages prepared by plaintiff's counsel), *appeal dismissed,* 351 U.S. 959, 76 S.Ct. 860, 100 L.Ed. 1481 (1956); *with United States v. Adams,* 385 F.2d 548, 550–51 (2d Cir.1967) (court impermissibly gave jury incriminating writings by government agent which had not been received in evidence).

█ B. *The Log Book.* Appellants raise as error the admission in evidence of the aircraft log book. The basis of their objection was lack of foundation, authenticity, completeness, and accuracy. There was deposition testimony from a pilot, however, that he was required to fill out a maintenance log on each flight and that maintenance problems would be routinely noted in the log. This, coupled with the testimony of John Burns of IAL that the log book was kept on the aircraft and that it was reviewed regularly in the course of business, supports admissibility as a record within the ambit of Federal Rule of Evidence 803(6).

█ C. *Jurisdiction Over Foreign Flights.* On June 3, 1977, the plane transported cargo from San Jose, Costa Rica, to Caracas, Venezuela; on July 10, 11, 12, 14 and 15, 1977, the plane, subleased to LANI-CA, the Nicaraguan National Airlines, flew meat from Managua, Nicaragua, to Caracas, Venezuela. We are asked to consider whether the FAA properly could assert jurisdiction over these foreign flights.

We have set forth the regulatory scheme above. The Federal Aviation Administration's mandate is "to promote the safety of flight of civil aircraft in air commerce," 49 U.S.C. § 1421(a)(6), and it is "air commerce" of commercial operations that is regulated by Part 121 of 14 C.F.R. "Air commerce" is defined by the Act to mean "interstate, overseas or foreign air commerce ... or any operation or navigation of aircraft which directly affects, *or which may endanger safety in, interstate, overseas or foreign air commerce.*" 49 U.S.C. § 1301(4) (emphasis added). The safety of foreign air commerce—"the carriage by aircraft of ... property ... for compensation or hire ... in commerce between ... a place in the United States and any place outside thereof" 49 U.S.C. § 1301(24)(c)— may most certainly be endangered on the facts proved at trial. The endangerment is twofold. First, other United States planes fly from the United States to these international airports, including scheduled passenger flights to Caracas and San Jose. Second, the plane at all times employed a United States crew supplied by Air-Trans. Recognizing that the term "air commerce" will be broadly construed to effectuate a valid congressional purpose, *see, e.g., United States v. Healy,* 376 U.S. 75, 83–85, 84 S.Ct. 553, 558–559, 11 L.Ed.2d 527 (1964); *United States v. Busick,* 592 F.2d 13, 20 (2d Cir.1978), we do not find that appellants have raised any compelling arguments against FAA jurisdiction over these flights. We distinguish *Hansen v. Arabian American Oil Co.,* 100 F.Supp. 183, 184–85 (E.D.N.Y.1951), *aff'd on other grounds,* 195 F.2d 682 (2d Cir.), *cert. denied,* 344 U.S. 828, 73 S.Ct. 31, 97 L.Ed. 645 (1952), where the operation of a private plane solely within a foreign country was held not within the ambit of the FAA rules. We specifically reject the contention that jurisdiction intrudes into the sovereignty of a foreign power. Quite simply, the FAA is fining an American entrepreneur and business entity, not the national airline of Nicaragua. If LANICA in fact had operational control of the plane, rather than Landy, IAL, and the Air-Trans crew, there would not have been any violation of Part 121 regulations.

### IV. The Violations

Landy and IAL's factual defense concentrated on the inapplicability of Part 121 regulations to their operations, rather than on controverting the Government's proof of specific violations. They contend, however, that erroneous rulings and jury instructions affected the jury's findings of violations.

A. *Deposition Notice.* The Government's evidence was offered in part by the deposition testimony of a pilot, Robinette, employed by Air-Trans for nearly half the flights in question. Landy contends that his due process rights were infringed by admission of this testimony because defense counsel lacked adequate notice that the deposition would be taken.[12]

The Federal Rules require reasonable written notice to opposing counsel before the taking of an oral deposition. Fed.R.Civ.P. 30(b)(1).[13] Ten days before trial, the Government located an Air-Trans pilot, who was unavailable for trial in New York. The Government notified defense counsel on Monday of the taking of Robinette's deposition on the following Friday in Tampa, Florida. During those four days defense counsel neither contracted the government's attorney, *see* S.D.N.Y. Civil Rule 3(f), nor sought expedited relief from the court, *see* Fed.R.Civ.P. 30(b)(3), but rather mailed a motion returnable eleven days later seeking an order vacating the notice. It is clear, however, that it is not the filing of such a motion that stays the deposition, but rather a court order. *Pioche*

12. Landy also urges that the taking of the deposition violated the pretrial scheduling order. The only such order, however, closed depositions on October 20, 1978, i.e. for the first trial, *see* note 1 *supra.* Judge Carter had not issued a scheduling order for the second trial.

13. A witness's deposition may be used at trial for any purpose against any party "who was present or represented at the taking of the deposition or who had reasonable notice," Fed. R.Civ.P. 32(a)(1), if the witness is over 100 miles from the courthouse. Fed.R.Civ.P. 32(a)(3)(B).

*Mines Consolidated, Inc. v. Dolman*, 333 F.2d 257, 269 (9th Cir.1964), *cert. denied*, 380 U.S. 956, 85 S.Ct. 1082, 13 L.Ed.2d 972 (1965). The court may take judicial notice of frequent flights from New York to Tampa, as well as availability of procedural remedies, in concluding that the deposition notice was reasonable. *Compare Mims v. Central Manufacturers' Mutual Insurance Co.*, 178 F.2d 56, 59 (5th Cir.1949) (notice of taking sixteen depositions in ten cities on the same date, served ten days before trial not "reasonable notice"). The trial court did not abuse its discretion in permitting the deposition testimony.

■ B. *The Inspection Manual*. Landy objected on grounds of irrelevance and prejudice to the admission of an inspection manual for the plane used by IAL in the course of its operations. The manual (which was in fact appropriate for a Convair 880 rather than for a Boeing 707) was relevant on the issue whether the defendants had violated FARs 121.367 and .369; an improper manual may not be used to inspect or maintain the aircraft. Because the manual was relevant, it was properly within the court's discretion to evaluate whether its probative value outweighed any prejudicial effect. Fed.R.Evid. 403; *Berman Enterprises, Inc. v. Local 333, United Marine Division ILA*, 644 F.2d 930, 938–39 (2d Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981).

## V. The Penalty

The penalty scheme of the Federal Aviation Act explicitly subjects "any person" who violates subchapter VI of the Act or any regulation issued thereunder to a civil fine not to exceed $1,000 for each violation. 49 U.S.C. § 1471(a)(1). Each day of a continuing violation is a separate offense.[14] *Id.* Penalties should reflect the nature, circumstances, extent, and gravity of the viola-

tion; the culpability, history of prior offenses, ability to pay, and effect on the ability to continue to do business of the person fined; and "other matters as justice may require." *Id.* The Secretary of Transportation may compromise any civil penalty, 49 U.S.C. § 1471(a)(2), but where the parties do not agree on payment of the penalty, as in the present case, the agency may bring a collection proceeding in federal district court. 49 U.S.C. § 1473(b)(1).

This authority and the district court's role is not seriously challenged, nor could it be, especially where, as here, the facts constituting violations were found by a jury. *See, e.g., United States v. Ward*, 448 U.S. 242, 248–51, 100 S.Ct. 2636, 2641–42, 65 L.Ed.2d 742 (1980); *Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, 430 U.S. 442, 450–51, 97 S.Ct. 1261, 1266–67, 51 L.Ed.2d 464 (1977); *Helvering v. Mitchell*, 303 U.S. 391, 401–04, 58 S.Ct. 630, 634–35, 82 L.Ed. 917; *United States v. J.B. Williams Co.*, 498 F.2d 414, 421–22 (2d Cir.1974). *See generally* K. Davis, I *Administrative Law Treatise* § 3:11 (2d ed. 1978). Landy does, however, attack the sanctions as "grossly disproportionate" and "unreasonably harsh" under the circumstances. We address Landy's challenge to the manner in which the violations were counted.[15]

The gravamen of Landy's argument on appeal is that the district court "double counted" violations. At first glance, some violations, *see* note 2 *supra*, do appear to be duplicative. Failure to prepare a manual, for example, necessarily causes violation of the requirement to furnish a copy to the FAA, or to have a maintenance organizational chart or emergency crew functions in the manual, or to have the required manual on the plane for use by the crew, or to include in the manual a procedure to certify pilot familiarity with a route or airport. Failure to establish a crew and dispatcher

---

**14.** Judge Carter's calculation on a per flight rather than per day basis, *see* note 3 *supra*, is not error because each flight occurred on a separate day.

**15.** We put aside Landy's Eighth Amendment claim, finding it frivolous in the light of the

Supreme Court's rulings in *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), and *Hutto v. Davis*, 445 U.S. 947, 100 S.Ct. 1593, 63 L.Ed.2d 782 (1980) (vacating) *Davis v. Davis*, 601 F.2d 153 (4th Cir.1979) (en banc).

training program subsumes failure to obtain FAA approval of the nonexistent training program. On further reflection, however, we find that the violations are distinct.

■ The test of whether charges are multiplicious is, in important part, one of legislative intent. Congress should indicate clearly that it contemplated separate violations, because a determination that separate violations are involved makes it possible to fine cumulatively. *See generally* 1 C. Wright, Federal Practice and Procedure 2d § 142, at 476–78. *See also United States v. Reed*, 639 F.2d 896, 904 (2d Cir.1981). The regulatory scheme at issue here clearly states discrete harms. A person who complies with some of the manual requirements, for example, but fails to furnish a copy to the FAA, is subject to a fine for that one discrete violation. It would be anomalous to reward the person who totally ignores the manual requirements by concluding that he, too, is subject to but a single fine when he simultaneously violates several regulations. Other juries have found multiple violations. *See, e.g., United States v. Lockheed L–188 Aircraft,* 656 F.2d 390, 393 (9th Cir.1979) ($165,600 in fines for 552 separate violations of Part 121 regulations).

■ Landy and IAL carry this unsuccessful argument to its logical extreme when they state that because the plane did not have a Part 121 certificate, it could not operate in violation of Part 121 regulations, which they say bind only certificate holders. A plain reading of the regulations refutes the argument. FAR 121.4 specifically makes the Part 121 rules apply not only to certificated persons, but "also to any person who engages in an operation governed by this part [Part 121] without the appropriate certificate and operations specifications." [16]

■ As well as challenging the manner in which the violations were counted, Landy and IAL challenge the court's consideration of matters not determined by the jury. The statute makes it explicit, as we have noted above, that penalties should reflect a broad range of factors. Judge Carter addressed these factors in his opinion and we find no ground for concluding that he abused his discretion.

The Federal Aviation Act requires carriers "to perform ... services with the highest degree of safety in the public interest." 49 U.S.C. § 1421(b). The regulations outline minimum standards of safety. 49 U.S.C. § 1421(a)(6); *In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975,* 635 F.2d 67, 75 (2d Cir.1980). As the district court noted,

> [f]ailure to comply with regulations relating to training of personnel, equipment, facilities and operational procedures poses a serious public hazard. The FAA .... must depend largely on voluntary adherence to the rules it promulgates .... While there is no evidence of an actual danger to public safety on any flight in which defendant bypassed the FAA regulations, that fortunate happenstance is totally irrelevant. The violations trenched broadly on all the substantive requirements for commercial operations designed to insure public safety and were in cavalier contempt for the regulatory system itself. Since there can be no issue here of mistake or inadvertence, at the

16. Landy raises the reverse argument in challenging the court's charge to the jury on specific violations, and we also reject this argument. Thus, he claims that operation of the aircraft without a ground proximity warning system (FAR 121.360), a flight data recorder (FAR 121.343), a life raft (FAR 121.339), or a first aid kit (FAR 121.309) would subject only the airmen, not the owner-operator, to fines, because these regulations go to the conduct of a "person," not a "certificate holder." The former term, however is broader, not narrower, than the latter. The Act defines "person" to mean "any individual, firm, copartnership, corporation, company, association, joint stock association, or body politic; and includes any trustee, receiver, assignee, or other similar representative thereof." 49 U.S.C. § 1301(32) (Supp. IV 1980). Further "airmen" is defined by the statute, *id.* § 1301(7), and the FAA would have used that narrower term if parts of the regulations were to be applicable only to those individuals. *See, e.g., United States v. Duncan,* 280 F.Supp. 975 (N.D.Tex.1968) (pilot shall use oxygen mask, FAR 121.333(c)(31)).

very least, these violations require sanctions as a guard against similar violations by others in the future.

*Landy v. FAA,* 16 Av.Cas. (CCH) 18,165, 18,166 (S.D.N.Y. Feb. 9, 1982).

Landy and IAL have failed in their arguments on appeal, and the judgment of the district court is hereby affirmed.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

Because air safety ranks somewhere in pecking order between motherhood and the American flag, it would be easy to concur fully in the majority opinion. In explaining my inability to do so, a good starting point is the following excerpt from the district court's opinion:

> While there is no evidence of an actual danger to public safety on any flight in which defendant bypassed the FAA regulations, that fortunate happenstance is totally irrelevant.

In pursuance of this logic, the district court fined appellants $21,000 because instructions on the first aid kit in appellants' German-built cargo plane were printed in German. Section 121.309(a) and (b) of Vol. 14 of the Code of Federal Regulations provides that no person may operate an airplane unless it is equipped with one or more first aid kits. Although section 121.-309(b)(3) requires only that such a kit be "clearly identified and clearly marked to indicate its method of operation", the district court charged that, for such instructions to be clear, they must be in "language understandable to the crew." Assuming without deciding that "language understandable to the crew" was necessary to identify the first aid kit on appellants' plane and to indicate its "method of operation", there is no proof that one or more members of appellants' crew did not understand German. Indeed, the fact that some entries in the plane's logbook during the period at issue were made in German would indicate that such understanding did exist.

Appellants were fined another $21,000 because placards on the crew's life raft were printed in German. Once again, the Government completely failed to establish that appellants' crew, experienced in plane operation and international travel, were unable to identify the device in question as a life raft or to understand how it operated. Moreover, the district court erred prejudiciously when it permitted the FAA maintenance inspector to testify he "felt" that instructions in German were contrary to regulations but prohibited defense counsel from eliciting a contrary answer on cross-examination.

Although, as the district court found, there was "no evidence of an actual danger to public safety" from violations such as the use of German language on the crew's first aid kit and life raft, the district court's conclusion that "this fortunate happenstance is totally irrelevant" is not entirely true. Seven of the twenty-eight flights, for which liability totalling $94,500 has been imposed, were conducted entirely outside the United States. Six of these flights were between Managua, Nicaragua and Caracas, Venezuela, while the plane was leased to Lineas Aereas de Nicaragua, that country's national airline. The seventh was between San Jose, Costa Rica and Caracas. The Government did not allege in its pleadings that FAA regulations were violated on those flights. This, I suggest, was because the FAA, and perforce the district court, were without jurisdiction to impose liability for conditions existing during the seven flights, which, as the district court found, posed no danger to public safety.

The FAA is empowered "to promote safety of flight of civil aircraft in air commerce" by promulgating appropriate standards and regulations. 49 U.S.C. § 1421. "Air commerce", as defined in 49 U.S.C. § 1301(4) and (20) refers only to flights that originate or terminate in the United States or its territories or which "may endanger safety" in flights that do. The majority's assertion that flights in and out of the United States "may most certainly be endangered on the facts proved at trial", is unwarranted. There is not one iota of proof in the record to rebut the district court's finding of no actual danger to public

safety, much less sufficient proof to make that finding clearly erroneous.

As pointed out in our first opinion, 635 F.2d at 147, the Government has "thrown the book" at appellants in an attempt to secure the largest possible fine. This is FAA's admitted policy:

> ... [W]hen we feel there is a serious violation or serious numbers of violations that requires significant deterrent effect, we have been forced to go out and scrape up every possible violation of the Regulations that is appropriate in order to compute these large penalties.

Testimony of Clark Onstad, Chief Counsel, FAA before the Subcommittee on Aviation of the Committee on Public Works and Transportation, House of Representatives, 96th Cong., 2d Sess. July 1, 1980, Record of Hearing on H.R. 7488 at 38.

Even the district judge, whose sympathies quite obviously were not with appellants, could not abide the Government's attempt to make two flights out of each carriage of goods from the United States to Europe because the plane had to refuel at Gander, Newfoundland.

I agree with my colleagues that appellants violated the law and must be held to account. I would affirm a judgment against appellant Landy in the amount of $250,000 and against appellant International Aircraft Leasing, Inc. in the amount of $125,000. To the extent that the judgments appealed from exceed those amounts, I respectfully dissent.