U.S. v. Emerson                          CV-94-152-JD  04/23/96 P

UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE


United States of America

        v.                             Civil No. 94-152-JD

Alan D. Emerson, Individually
And d/b/a Emerson Aviation


                        O P I N I O N


        The plaintiff, the United States of America, has brought

this action against the defendants, Alan Emerson d/b/a/ Emerson

Aviation ("Emerson Aviation") and Alan Emerson, individually, to

recover a civil penalty for past violations of federal aviation

law and to permanently enjoin future violations.  On March 29,

1996, the parties stipulated that the defendants are liable for

the operation of a number of specifically identified flights.  On

April 8 and 9, 1996, the court presided over a bench trial to

determine whether and to what extent it should grant the

government's request for a monetary fine and permanent injunctive

relief.

                          Rulings of Law

    1.   The parties have stipulated that this action is

governed in part by 49 App. U.S.C. § 1471, a civil penalty

statute which was in force at the time this action was filed in

March 1994.

2. The parties also have stipulated that the following flights were operated by the defendants as charter flights which carried passengers from one point to another for compensation in violation of 49 App. U.S.C. § 1471 and 14 C.F.R. Part 135:

| Date | Customer | Details |
|------|----------|---------|
| December 4, 1992 | Pike Industries | Round Trip |
| December 15, 1992 | Pike Industries | Round Trip |
| April 20, 1993 | Pike Industries | Round Trip |
| June 16, 1993 | Pike Industries | Round Trip |
| March 11, 1993 | Wickers Sportswear | |
| March 12, 1993 | Wickers Sportswear | |
| March 25, 1993 | Wickers Sportswear | |
| March 26, 1993 | Wickers Sportswear | |
| April 14, 1993 | Wickers Sportswear | |
| April 15, 1993 | Wickers Sportswear | |
| April 28, 1993 | Wickers Sportswear | |
| April 29, 1993 | Wickers Sportswear | |
| April 29, 1993 | Wickers Sportswear | |
| May 1, 1993 | Wickers Sportswear | |
| May 18, 1993 | Wickers Sportswear | |
| May 18, 1993 | Wickers Sportswear | |
| May 24, 1993 | Wickers Sportswear | |
| May 25, 1993 | Wickers Sportswear | |
| June 8, 1992 | Franklin Brush Co. | Round Trip |
| September 10, 1992 | Franklin Brush Co. | Round Trip |
| October 29, 1992 | Franklin Brush Co. | Round Trip |
| March 8, 1993 | Franklin Brush Co. | Round Trip |
| April 5, 1993 | Franklin Brush Co. | One Way |
| May 3, 1993 | Franklin Brush Co. | Round Trip |
| June 1, 1993 | Franklin Brush Co. | Round Trip |
| July 16, 1993 | Franklin Brush Co. | Round Trip |

Joint Stipulation on Liability, 3/29/96

3. The court finds that, based on a common sense reading of the unambiguous statute, a round-trip flight conducted in

2

violation of the federal aviation laws constitutes two separate violations for purposes of calculating damages. See 29 App. U.S.C.A. § 1471(a)(1) (1994) ("If such violation is a continuing one, each day of such violation, or each flight with respect to which such violation is committed, if applicable, shall constitute a separate offense."). This ruling is consistent with the view that an unlawful trip from a place of origin to an ultimate destination constitutes a single violation but that intermediary stops or flights legs, such as those required for refueling, are incidental and do not constitute additional violations. See F.A.A. v. Landy, 566 F. Supp. 921, 924 (S.D.N.Y. 1982) (for purpose of imposing civil penalties, court did not count "the leg of a continuous trip," to an ultimate destination, i.e., each takeoff and landing, as a separate violation), aff'd, 705 F.2d 624 (2d Cir. 1983).

4. Thus, as a matter of law, the stipulated unlawful operation of eleven round-trip flights and fifteen one-way flights collectively constitute thirty-seven separate violations subject to a civil penalty.

5. The parties agree that the maximum civil penalty for each violation is $10,000. 49 App. U.S.C.A. § 1471(a)(1) (West 1994).

3

6.    The court's calculation of an appropriate civil penalty requires a fact-specific inquiry:

> Penalties should reflect the nature, circumstances, extent, and gravity of the violation; the culpability, history of prior offenses, ability to pay, and effect on the ability to continue to do business of the person fined; and "other matters as justice may require."

F.A.A. v. Landy, 705 F.2d 624, 635 (2d Cir. 1983) (quoting and adopting considerations from 49 U.S.C. § 1471(a)(1)).  The court finds that the deterrence of other potential violators is an implicit goal of the civil penalty provisions, and therefore a proper penalty consideration, given the government's obvious concern with aviation safety and its heavy reliance on voluntary compliance with aviation laws.  See United States v. Emerson, No. 94-152-JD, slip op. at 6 (D.N.H. 3/29/96) (noting the aviation statutes' "heavy emphasis" on promoting safety); accord Landy, 705 F.2d at 637 (Van Graafeiland, J., dissenting) (noting that "air safety ranks somewhere in pecking order between motherhood and the American flag").

7.    The parties also agree that the government is entitled to request a permanent injunction as an additional, equitable remedy for the stipulated violations.  The relevant statute in force at the time this action was filed provides that the

> Attorney General . . . may apply to the district court of the United States . . . for the enforcement of such provision of this chapter, rule, regulation, requirement, order, term, condition, or limitation; and such

4

court shall have jurisdiction to enforce obedience thereto by a writ of injunction or other process, mandatory or otherwise, restraining such person, his officers, agents, employees, and representatives from further violation.

49 App. U.S.C.A. § 1487(a) (West 1994).


Findings of Fact

Based on the documentary evidence, trial testimony, and the stipulations submitted by the parties, the court makes the following findings of fact:


A.   Enforcement History

1.   The defendants' admitted liability in this action is based in part on prior FAA enforcement actions.  The defendants agree that they were subject to the following sanctions:

a.   On May 12, 1992, the government revoked on an emergency basis Alan Emerson's airman certificate for lacking the care, judgment, and responsibility required of certificate holders.  The revocation was effective immediately and was upheld on appeal by the National Transportation Safety Board ("NTSB") on June 24, 1992.

b.   On May 12, 1992, the government revoked on an emergency basis Emerson Aviation's air taxi certificate ("ATCO") for operating an aircraft which was not in an airworthy condition, failing to repair aircraft defects, and failing to report aircraft defects to the FAA or the manufacturer.  The revocation was effective immediately and was upheld on appeal by the NTSB on June 24, 1992.

c.   Following these revocations, the defendants repeatedly violated the federal aviation laws by operating the flights

5

identified in the joint stipulation on liability, listed supra.

2. The defendants also have been subject to a number of FAA enforcement actions prior to those giving rise to the instant litigation. At trial the defendants acknowledged that the enforcement history includes the following:

a. On November 2, 1990, the government suspended Alan Emerson's airman certificate for 90 days for entering restricted airspace near Pittsburgh, Pennsylvania without proper authorization. The suspension was upheld on appeal by the NTSB.

b. On August 9, 1991, the government revoked Alan Emerson's flight instructor certificate for making false endorsements in student flight records. The revocation was upheld on appeal by the NTSB.

c. On March 9, 1992, the government retroactively suspended one of Emerson Aviation's air taxi certificates for 365 days for numerous violations of federal aviation regulations.

B. Evidence of Mitigation

3. At trial the court granted the defendants considerable latitude in introducing evidence to mitigate or otherwise explain their admitted violations of the federal law. This evidence included the following:

a. In some instances the FAA's published literature was not entirely clear or consistent on the type of flights the defendants could operate following the revocation of their ATCO. For example, the FAA Advisory Circular distributed on April 24, 1986, and relied upon by the defendants appears to support a limited private carriage exception to the requirement that air carriers possess a Part 135 ATCO.

6

b.    The defendants relied on erroneous legal advice from attorney Vincent Butler concerning the legality of certain flights operated without proper FAA authorization.  This advice, which was rendered in connection with the Norman Waal flight from Keene, New Hampshire to Newark, New Jersey, confirmed the defendants' understanding of the private carriage exception.

c.    Discussions with Joseph ("Charlie") Smith, the owner of Charter ME., Sanford, Maine, also confirmed the defendants' understanding of the private carriage exception.

d.    The defendants' ability to comply with federal regulations was hampered by a poor relationship with government officials.  In particular, FAA safety inspector Gary Readio may have personalized his oversight of the defendants' activities and, in turn, may have subjected Emerson Aviation to an unusually aggressive enforcement effort.

e.    The defendants' purchase of advertising in the yellow pages and other media was not an intentional effort to hold Emerson Aviation out as a charter provider.  The advertising was initially purchased and designed at a time when the defendants were properly certified and this marketing effort was merely continued following revocation.

f.    Some of the defendants' past violations resulted from the failure of the defendants' employees to properly maintain company records as instructed.

g.    Although involved in at least a few accidents, including the emergency landing of a scenic flight, the defendants' admitted violations of federal law have not directly resulted in serious personal injury.

h.    Alan Emerson is a self-educated pilot and mechanic who possesses more than thirty years experience in the New Hampshire aviation industry.  He operated Emerson Aviation as a sole proprietor from 1976 to 1988 without sanction from the FAA.

7

C.   Evidence of Defendants' Ability to Pay

4.   Defendant Emerson Aviation, Alan Emerson's sole proprietorship, no longer performs aviation-related businesses.[1]

5.   Emerson Aviation, Inc. ("New Emerson") was incorporated by the New Hampshire Secretary of State in March 1994.  The president of New Emerson is Alan Emerson's wife, Brenda.  Alan Emerson is an employee but not an officer or shareholder of the corporation.

6.   New Emerson has succeeded to many of Emerson Aviation's business operations, assets, and liabilities.  New Emerson has never compensated Emerson Aviation for whatever assets or goodwill it acquired from Emerson Aviation.

7.   According to a January 17, 1995, financial statement, the defendants have an ownership interest in, inter alia, several aircraft, business real estate, including aircraft hangers and office space, located at the Laconia, New Hampshire airport, and residential real estate in Gilford, New Hampshire and in Stuart, Florida.  At the time, Alan Emerson listed the cash value of his

_____

[1]For purposes of this opinion and the assessment of the civil penalty Alan Emerson and his sole proprietorship, Alan Emerson d/b/a Emerson Aviation, are treated as the same financial entity, with the assets and liabilities of the business chargeable to the individual.  See Black's Law Dictionary at 1392 (6th ed. 1990) ("sole proprietor is soley liable for all the debts of the business"); see also In re San Juan Dupont Plaza Hotel Fire Litig., 45 F.3d 569, 573 (1st Cir. 1995) (relying on law dictionary definition of sole proprietorship).

assets as $611,500, an amount which included modest accounts receivable and a $15,000 debt owed by A.B.C. Aircraft & Leasing. Most if not all of Emerson's assets are encumbered by mortgages or liens which approach or exceed the total value of the assets. Alan Emerson listed a monthly salary of $1,000.

8.   Christopher Tierney, the defendants' accountant, testified that in 1994 his company, A.B.C. Aircraft Leasing, Inc., purchased various aircraft from the defendants for approximately $120,000, $100,000 of which was paid in cash and $20,000 of which Tierney paid in the form of forgiveness for an outstanding professional services debt.

9.   Tierney testified that the defendants' financial situation has deteriorated since January 1995, in part because the IRS has filed a blanket lien on all assets for an amount in excess of $160,000.

10.  New Emerson owns virtually no assets beyond three aircraft, two of which are currently airworthy and readily saleable and all of which are encumbered to some extent by creditors.  New Emerson's business has deteriorated since 1994, in part because of an unprofitable operation in Keene, New Hampshire, adverse publicity related to the instant action, and delays securing FAA approvals and receiving agency guidance for repairs undertaken on behalf of its customers.

## Conclusions

The government urges the court to assess a civil penalty of $8,500 for each of the thirty-seven violations, for a total penalty of $314,500 and to elevate the current temporary injunction to permanent status. The government justifies its request as necessary to penalize a seasoned violator who has repeatedly threatened public safety in the face of the FAA's enforcement activities. The government also seeks to deter other aviators from engaging in like conduct.

The defendants request leniency on the grounds that their violations are not nearly as egregious "as stated on the cold page of the complaint." The defendants rely heavily on evidence of mitigation and emphasize their limited ability to pay a monetary fine. The defendants also argue that a permanent injunction is unnecessary because they are currently in compliance with the law.

Considering the law and the facts, the court orders the defendants to pay a civil penalty of $5,000 for each of the thirty-seven violation, for a total penalty of $185,000. This penalty is based on the following findings and rulings:

1. The defendants repeatedly violated 49 App. U.S.C. § 1471 by operating the stipulated flights despite the emergency revocation of Alan Emerson's airman certificate and of Emerson

10

Aviation's ATCO. The defendants were fully aware of the revocation and the continued flight operations were either intentional violations of federal law or, at a minimum, were conducted with a reckless disregard of the aviation laws.

2. Prior to the enforcement actions which underlie the stipulated violations, the defendants repeatedly were sanctioned for violations of federal aviation laws. This enforcement history is significant and, based on the evidence before it, the court considers the defendants to be habitual offenders who view the government's regulation of their business with a troubling degree of contempt.

3. The defendants' evidence of the circumstances surrounding their violations has not in any meaningful way mitigated their liability or otherwise discounted the gravity of the stipulated violations for a variety of reasons. The defendants' claim that they believed they operated under a private carriage exception to Part 135 is unavailing. The court considers this and other explanations based on convenient interpretations of federal regulations and the reliance on the advice of counsel and other pilots to strain reason and common sense. The defendants' evidence of their reliance on counsel is particularly unpersuasive. There is no evidence of any written advice provided by counsel concerning the legality of certain

11

activities <u>prior</u> to the time the defendants engaged in the activities. For example, the defendants have introduced the November 3, 1993, correspondance from attorney Vincent Butler to the FAA in which Butler states his opinion that the Norman Waal flight from Keene, New Hampshire, to Newark, New Jersey, was a legal personal flight. However, such a letter cannot establish reliance because it plainly was written in response to a government investigation and not as a prophylactic effort on the defendants' behalf to establish the legality of contemplated future conduct. In any event, to the extent the defendants may have secured and relied upon oral legal advice concerning their conduct, the record contains little if any evidence as to what information counsel was provided prior to the rendering of the advice. Naturally, an attorney's opinion is only as good as the accuracy and completness of the information upon which it based. Moreover, the defendants' good faith reliance argument is particularly unconvincing given Alan Emerson's considerable aviation experience, his awareness that the FAA was watching him closely and interpreting rules strictly, and the fact that he lied to his son concerning the legality of certain flights.

4. It is evident that the defendants' strained relationship with the FAA magnified the dispute between the parties and may have led the government to proceed against the

12

defendants with unusual vigor. Moreover, the testimony of Alan Emerson, Charlie Smith, and Gary Readio supports the conclusion that the relationship between Mr. Readio and Mr. Emerson became hostile. Finally, the government has repeatedly acknowledged that the instant prosecution is designed, in part, to deter future violations. Nonetheless, the court squarely rejects the theory that the civil penalty should be reduced because the defendants were unjustly singled out as an enforcement target. The defendants operated in a heavily regulated industry in which compliance with a myriad of regulations, some of which to them may appear trivial, is essential to the overall goal of aviation safety. The defendants -- not subordinates, attorneys, or other pilots -- are responsible for full compliance and such a duty is never excused by the regrettable fact that they had a hostile relationship with Mr. Readio whose responsibility it was to enforce the governmental regulations in question. To the extent the defendants believed they had been mistreated by Readio, there were other avenues of relief that may have proven fruitful. Failure to comply or simply refusing to engage in a dialogue with the government is not an acceptable response.

5. The court rejects the defendants' contention that the volume of the admitted violations and the past enforcement history overstates the severity of their actual conduct. It is

of no moment that many of the violations involved record-keeping or other technical functions and that none resulted in serious personal injury. The federal aviation laws safeguard public safety as a collective whole and compliance with the entire regulatory scheme, and not just the rules governing matters that have an immediate and direct effect on life and limb, is presumed. The maintenance of proper records and like tasks is a crucial component in the prevention of accidents and, as such, the failure to comply cannot be viewed as a benign violation simply because of the clerical or technical nature of the violated regulations.

6. The defendant Alan Emerson is currently employed by New Emerson. The defendant Emerson Aviation is no longer a going concern to the extent that it does not perform any aviation services. Thus, in this case the defendants' ability to continue to do business is not a relevant penalty calculation factor.

7. The defendants' financial resources are minimal in view of their considerable indebtedness. The court finds that the defendants maintain an equity position in a variety of real estate and capital assets such as aircraft, even though most if not all of these assets are securing the defendants' outstanding debts. It is also plain that the FAA's enforcement activities in general, the instant lawsuit in particular, and the attendant

14

negative publicity have seriously impaired the defendants' and, by virtue of the apparent association, New Emerson's ability to attract and retain customers.  Finally, Alan Emerson draws a modest income as an employee of New Emerson and, at age 52, may reasonably be expected to continue working in some capacity for a number of years.  In light of these circumstances, the court finds that the defendants' limited ability to pay factors heavily in the civil penalty calculus.

8.    The court finds that the FAA lacks the resources to effectively monitor the activities of the many individuals and business entities that fall within its regulatory sphere.  As a result, aviation safety rests in large part on voluntary compliance by those who, in all probability, will never face the regulatory scrutiny encountered by the defendants.  However, the instant litigation underscores the critical importance of the aviation laws and the serious consequences which befall those who violate them.  A significant civil penalty will deter potential violators and, in turn, foster respect for and compliance with the law.

9.    The court is inclined to award a civil penalty at or near the magnitude requested by the government given the nature, circumstances, extent, and gravity of the defendants' violations, their high level of culpability, extensive enforcement history,

15

and the high potential to deter future violations. However, the court must take cognizance of the defendants' limited ability to pay the requested penalty and, based on this consideration alone, will reduce the amount from $8,500 per violation as requested by the government to $5,000 per violation, for a total penalty of $185,000 (37 violations x $5,000).

10. With respect to the request for injunctive relief, the court orders that the terms and conditions of the temporary injunction entered on February 14, 1995, be extended as provided herein. It is the opinion of the court that, given the considerations addressed in conjunction with the civil penalty assessment, supra, coupled with the critical goal of aviation safety, such an injunction is necessary to "enforce obedience" with the federal aviation laws. See 49 App. U.S.C. § 1487(a). The court notes that in this instance the requested injunction is not unduly burdensome because it merely mirrors the prior FAA enforcement actions by prohibiting the defendants from engaging in any activities for which their FAA licenses or certificates have been revoked and from exceeding the bounds of whatever certificates and licenses they may currently possess. However, the court vacates its February 14, 1995, order to the limited extent that the earlier order required "the defendants to provide a copy [of that order] to each Emerson Aviation employee and to

16

each individual who boards an airplane owned or operated by, or in conjunction with, Emerson Aviation." The defendants are no longer under any duty imposed by this court to inform others of the instant action

The court is required to describe in reasonable detail the acts to be restrained by an injunction. Fed. R. Civ. P. 65(d). The court enters the following permanent injunction:

> A)   Alan Emerson, as an individual, shall not perform any aviation-related acts unless and until he validly possesses the proper FAA authority to do so; and
>
> B)   Emerson Aviation, as an entity, shall not perform any aviation-related acts unless and until it validly possesses the proper FAA authority to do so. This prohibition includes any conduct which would require an air taxi certificate under 14 C.F.R. § 135 et seq.;
>
> C)   Both defendants shall comply immediately with all regulations, policies, and orders promulgated by the FAA or other regulatory agencies; and
>
> D)   This injunction is binding on the defendant Alan Emerson, as an individual, and defendant Alan Emerson d/b/a Emerson Aviation, an entity, and its officers, agents, employees and others in active concert or participation with it as provided by Fed. R. Civ. P. 65(d).

## Summary

The clerk shall enter judgment in the government's favor. The defendants shall pay a civil penalty of $185,000 and shall at all times adhere to the permanent injunction described supra.

17

The February 14, 1995, order is vacated to the extent described by this order.

      SO ORDERED.


_____
Joseph A. DiClerico, Jr.
Chief Judge

April 23, 1996

cc:  Patrick M. Walsh, Esquire
     John P. Kalled, Esquire